**In re TRENTON RIDGE INVESTORS, LLC and Coventry East Investors, LLC, Debtors and Debtors in Possession.**

Nos. 09–62570, 09–63160.

United States Bankruptcy Court, S.D. Ohio, Eastern Division, at Columbus.

June 23, 2011.

Thomas R. Allen, Allen Kuehnle Stovall & Neuman LLP, Columbus, OH, for Debtors.

### MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF DEBTORS' PLANS OF REORGANIZATION

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## Table of Contents

I. Introduction ..................................................451

II. Jurisdiction...................................................452

III. Background ........................................................... 452
 A. The Debtors and Their Chapter 11 Cases ............................. 452
 B. Summary of the Plans and the Results of Voting ...................... 452

IV. Arguments of the Parties .............................................. 455

V. Legal Analysis ......................................................... 455
 A. Confirmation of Consensual Plans Under Section 1129(a) of the
 Bankruptcy Code ................................................ 455
 B. Confirmation of Non–Consensual Plans Under Section 1129(b) of the
 Bankruptcy Code ................................................ 458
 C. The Court's Independent Duty to Determine Compliance with the
 Bankruptcy Code's Confirmation Standards ....................... 458
 D. The Debtors' Burden of Proof ...................................... 459
 E. Application of the Confirmation Requirements ....................... 463
 1. Applicable Requirements of Section 1129(a) ...................... 463
 a. Section 1129(a)(1): Plan's Compliance with Applicable Provisions
 of the Bankruptcy Code ...................................... 463
 i. Section 1122: Classification ............................... 463
 ii. Section 1123: Contents of the Plan ........................ 466
 b. Section 1129(a)(2): Proponent's Compliance with Applicable
 Provisions of the Bankruptcy Code ........................... 467
 c. Section 1129(a)(3): Good Faith ............................... 467
 d. Section 1129(a)(4): Payments Subject to Court Approval ........ 472
 e. Section 1129(a)(5): Disclosure of Identity and Affiliations of
 Certain Individuals .......................................... 473
 f. Section 1129(a)(7): The Best–Interests–of–Creditors Test ....... 473
 g. Sections 1129(a)(8)-(9) and (a)(12) ........................... 475
 h. Section 1129(a)(10): At Least One Impaired Accepting Class ..... 476
 i. Section 1129(a)(11): Feasibility ............................... 478
 i. In General ............................................... 478
 ii. The Effective Date ....................................... 479
 iii. The Debtors' Post–Effective Date Tax Obligations ........... 483
 iv. The Debtors' Five–Year Projections ........................ 484
 1. Income ............................................. 484
 2. Expenses ........................................... 486
 v. The Cash Infusion from the Member Noteholders ............ 488
 vi. The Economic Life of the Trenton Ridge Apartments and
 the Coventry Apartments ................................. 491
 vii. The Trenton Ridge Balloon Payment ....................... 493
 2. Section 1129(b): The Requirements for Cramdown ................. 494
 a. Unfair Discrimination ....................................... 495
 b. Fair and Equitable Standard as Applied to PNC's Claims ........ 495
 i. Compliance with the Technical Requirements of
 1129(b)(2)(A)(i) .......................................... 496
 ii. Compliance with the General Requirement that a Plan Be
 Fair and Equitable ....................................... 498
 c. The Fair and Equitable Standard as Applied to ATF's Claim ..... 506
 d. The Fair and Equitable Standard as Applied to General
 Unsecured Claims .......................................... 507

VI. Conclusion ........................................................... 510

### I. Introduction

In this contested matter, Trenton Ridge Investors, LLC ("Trenton Ridge") and Coventry East Investors, LLC ("Coventry," and collectively with Trenton Ridge, "Debtors"), seek confirmation of their

Chapter 11 plans ("Plans").[1] PNC Bank, National Association ("PNC") opposes confirmation.[2] For the reasons set forth below—primarily, the lack of sufficient evidence establishing the "feasibility" of the Plans and the Debtors' failure to provide unsecured creditors with the treatment required by the "absolute priority rule"—the Court must deny confirmation of both of the Plans.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(L).

## III. Background

### A. The Debtors and Their Chapter 11 Cases

Both of the Debtors are Ohio limited liability companies operating multi-family apartment complexes in Columbus, Ohio. One of the complexes, which was constructed in 1973, lies on an approximately 16–acre tract of land owned by Trenton Ridge and consists of 272 townhouse units ("Trenton Ridge Apartments"). The other complex, which was constructed in 1972, lies on an approximately 26–acre tract of land owned by Coventry and consists of 320 garden and townhouse units ("Coventry Apartments").

With receivership proceedings relating to the operation of the Trenton Ridge Apartments and the Coventry Apartments pending in state court, the Debtors commenced these cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code–Trenton Ridge on October 28, 2009 and Coventry on November 9, 2009. During their cases, the Debtors have used certain rents on which PNC has a lien pursuant to cash collateral orders approved by the Court and extensions thereof stipulated to by the Debtors and PNC.

### B. Summary of the Plans and the Results of Voting

The parties in interest in these Chapter 11 cases, their proposed treatment under the Plans and the manner in which they voted on the Plans is summarized below.

Since November 2007, the co-managers of both of the Debtors have been John R. Davis ("Davis") and Patricia J. Shorr ("Shorr"). The Debtors anticipate that Davis and Shorr will continue to serve as co-managers after confirmation. Davis and Shorr have not asserted a claim against either of the Debtors. But they do hold—either directly or indirectly—equity in the Debtors in the form of membership

1. Trenton Ridge's plan (Doc. 100), as amended by Doc. 167 and Doc. 174 ("Second Trenton Ridge Plan Modification") will be referred to as the "Trenton Ridge Plan," and Coventry's plan (Doc. 102), as amended by Doc. 168 ("First Coventry Plan Modification") and Doc. 175 ("Second Coventry Plan Modification") will be referred to as the "Coventry Plan."

2. PNC filed an objection to the Trenton Ridge Plan (Doc. 156) ("PNC Trenton Ridge Objection"), an objection to the Coventry Plan (Doc. 155) ("PNC Coventry Objection") and supplemental objections to each of the Plans (Docs. 163 and 164). A hearing on confirmation of the Trenton Ridge Plan and the Coventry Plan ("Confirmation Hearing") was held over two days. The Court will refer to the transcript of the Confirmation Hearing held on the first day (Doc. 197), as "Tr. I" and the transcript of the Confirmation Hearing held on the second day (Doc. 199), as "Tr. II." The Debtors filed a joint post-hearing brief (Doc. 209), and PNC filed its post-hearing briefs with respect to the Trenton Ridge Plan (Doc. 212) ("PNC Trenton Ridge Br.") and with respect to the Coventry Plan (Doc. 213) ("PNC Coventry Br."). The Debtors filed a reply ("Debtors' Reply") (Doc. 218).

interests. The Plans provide that the equity interests held by Davis and Shorr, along with all other existing equity interests, will be cancelled on the effective date. The holders of those interests, therefore, were deemed to have rejected the Plans and were not entitled to vote. Davis and Shorr would receive membership interests in the reorganized Debtors pursuant to the Plans.

Certain of the other current holders of the membership interests (not Shorr and Davis) also received promissory notes from Trenton Ridge and Coventry. The members who received such notes will be referred to in this opinion as the "Member Noteholders." Under the Plans, the Member Noteholders are to receive a pro-rata share of membership interests in the reorganized Debtors. As a class, the Member Noteholders voted to accept both of the Plans.

The creditor holding the vast majority of the debt in these cases is PNC, which filed timely proofs of claim against both Debtors. It has asserted a claim against Trenton Ridge on account of a note dated March 21, 2005, as amended ("Trenton Ridge Note"), secured by substantially all of Trenton Ridge's assets, including the Trenton Ridge Apartments and rents generated therefrom by virtue of an Open–End Mortgage, Assignment of Rents and Security Agreement, dated March 21, 2005, as modified on November 28, 2007. PNC also has asserted a claim against Coventry on account of two notes, each dated September 20, 2005, as amended ("Coventry Notes"); that claim is secured by substantially all of Coventry's assets, including the Coventry Apartments and the rents generated from the operation therefrom pursuant to two Open–End Mortgages, Assignments of Rents and Security Agreements, both executed on or about September 20, 2008. As of the dates

Trenton Ridge and Coventry commenced their Chapter 11 cases, the Trenton Ridge Note and the Coventry Notes had matured.

PNC has filed notices (Docs. 141 & 142) of its election to have its claims treated as fully secured pursuant to § 1111(b) of the Bankruptcy Code. In the Plans, the Debtors have provided for the retention by PNC of its liens and the payment of its claims in accordance with its § 1111(b) election, with a 40–year amortization (and a 30–year balloon payment) for Trenton Ridge and a 30–year amortization for Coventry with no balloon payment. During the Confirmation Hearing, the Debtors and PNC entered into the stipulations summarized below:

For purposes of the Confirmation Hearing only, the values of the Trenton Ridge Apartments and the Coventry Apartments are as set forth in Trenton Ex. 3 and Coventry Ex. 3, respectively. *See* Tr. I at 5:14–24. Accordingly, the value of the Trenton Ridge Apartments is $3,660,000, *see* Trenton Ex. 3, The Robert Weiler Company Appraisal of Trenton Ridge Apartments, Effective Date of July 14, 2010 ("Trenton Ridge Appraisal"), and the value of the Coventry Apartments is $5,120,000. *See* Coventry Exhibit 3, The Robert Weiler Company Appraisal of Coventry East Apartments, Effective Date of July 14, 2010 ("Coventry Appraisal" and, collectively with the Trenton Ridge Appraisal, "Weiler Appraisals").

For purposes of whether the proposed Plans are fair and equitable under 11 U.S.C. § 1129(b)(2), the proposed 5.5% interest rate to be paid on PNC's claims "is a rate that is consistent with fair and equitable treatment under that section." Tr. I at 6:9–11.

The monthly payment amounts to PNC under the Plans, if confirmed, will

be $27,835.45 with respect to Coventry and $14,198.43 with respect to Trenton Ridge. *See id.* at 7:7–11.

For purposes of the Confirmation Hearing, the amount due and owing to PNC by Trenton Ridge is $7,747,780.57 and by Coventry is $7,703,964.34. *See id.* at 8:14–17.

Although most terms and conditions of the Debtors' loan documents with PNC would remain in full force and effect following confirmation, the Plans would modify certain of those terms and conditions. As described below, however, the only modifications that PNC opposes are the modification of the length of the repayment period and the modification of the due-on-sale clauses. PNC, which holds the sole claim in the classes in which it is classified, voted to reject both of the Plans.

Each of the Plans also includes a class of employment-related claims having priority under § 507(a)(4) of the Bankruptcy Code; those claims are unimpaired (and therefore not entitled to vote), and there appears to be no such unpaid claims in any event. Each of the Plans also includes a class of holders of tenant security deposits having priority under § 507(a)(7) of the Bankruptcy Code; the claims in those classes, if any, are to receive payment in full soon after the effective date of the Plans, and those classes have accepted the Plans.

Both of the Debtors also owe prepetition real estate taxes to the Treasurer of Franklin County, Ohio ("County Treasurer"). Under the Plans, the County Treasurer is to retain the liens securing the claims and is to receive full payment, with interest, over a period of 60 months. The County Treasurer accepted both of the Plans.

Each of the Plans also includes a class of general unsecured claims. Each holder of an allowed claim in those classes is to receive its pro rata share of certain quarterly payments. According to the Plans, those payments will continue until the earlier of: (1) payment in full of all allowed claims in the class, without interest; or (2) the date that is five years from the applicable petition date. No general unsecured creditor voted and, therefore, as discussed below, the classes of general unsecured creditors did not accept either of the Plans.

As described above, the Plans have many common features. One difference between the Plans previously mentioned, however, is the proposal to satisfy PNC's claim with a 30–year balloon payment under the Trenton Ridge Plan, while no balloon payment is proposed in the Coventry Plan. The only other material difference is that Trenton Ridge, unlike Coventry, owes a debt to American Tax Funding, LLC ("ATF"), and will need a cash infusion—described in more detail below—from the Member Noteholders in order to satisfy that debt. Under the Trenton Ridge Plan, ATF is to retain its lien and is to receive payment in full on or before the date that is 72 months after the date of purchase of the respective tax certificates by ATF from the County Treasurer, with interest accruing at the statutory rate of interest reflected on the respective tax certificates acquired from the County Treasurer. ATF did not vote and, therefore, as discussed below, did not accept the Trenton Ridge Plan.

Upon confirmation, the Debtors would fund most of their obligations under the Plans with cash from operations. In addition, as previously noted, Trenton Ridge intends to request an infusion of cash from the Member Noteholders in order to fully satisfy the obligation to ATF. During the Confirmation Hearing, the Debtors presented evidence regarding, among other things, their ability to fund the Plans based on their projections of revenue and

expenses and their intention to obtain a cash infusion from the Member Noteholders.

### IV. Arguments of the Parties

PNC contends that the Plans fail to comply with three requirements that a non-consensual plan must meet in order to be confirmed. In the order they appear in the Bankruptcy Code, those requirements—and the bases for PNC's objections—are that the Plans must be proposed in good faith, that the Plans must be feasible and that they must provide for fair and equitable treatment of PNC's claims.

According to PNC, the Plans were not proposed in good faith based on, among other things, (1) the Member Noteholders receiving ownership interests in the reorganized Debtors without providing any value in exchange for it and (2) the Debtors allegedly artificially impairing certain classes of creditors for the purpose of obtaining an accepting class. The Debtors respond by pointing out that their reason for filing the Plans was to make a legitimate attempt to reorganize their businesses and that this is sufficient indicia of their good faith in proposing the Plans.

PNC's position regarding the infeasibility of the Plan hinges on three arguments common to both Debtors and two arguments applicable only to Trenton Ridge. According to PNC, both Trenton Ridge and Coventry (1) overstate their projected income and understate their projected expenses, (2) lack the ability to make payments due on or near the effective date of the Plans and (3) will be unable to service their obligations to PNC for the durations of the Plans. In addition, PNC contends that there is insufficient evidence that Trenton Ridge will be able to obtain the cash infusion required to pay ATF or to make the balloon payment to PNC of $2.5 million in year 30. For their part, the Debtors assert that they need demonstrate only a reasonable assurance of commercial viability, which they believe they have done.

PNC's third argument—that the Plans are not fair and equitable—is primarily based on the extended repayment periods provided for in the Plans. In addition, according to PNC, other factors demonstrating that the Plans do not satisfy the fair and equitable standard are: (1) the Member Noteholders' receipt of equity in the reorganized Debtors without making a capital contribution; (2) the failure of the stipulated interest rate to compensate PNC for the risk imposed by the lengthy amortization period and the balloon payment; (3) the use of PNC's cash collateral to make payments under the Plans; and (4) the modification of the due-on-sale clauses. The Debtors dispute each of these points and contend that the Plans do provide PNC's claims with fair and equitable treatment.

### V. Legal Analysis

#### A. Confirmation of Consensual Plans Under Section 1129(a) of the Bankruptcy Code

Section 1129 of the Bankruptcy Code requires the Court to confirm a Chapter 11 plan that meets certain requirements. The requirements vary depending on whether the plan is consensual or non-consensual. The Court "shall confirm a plan" pursuant to § 1129(a) of the Bankruptcy Code, but "only if all" of the applicable requirements set forth in that subsection are met. 11 U.S.C. § 1129(a). One of these requirements is that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).

 In other words, the Court must confirm a plan under § 1129(a) if the plan is consensual, that is, if all impaired

classes have accepted it—thereby satisfying § 1129(a)(8)—and if it meets each of the other applicable requirements of § 1129(a). *See In re Future Energy Corp.*, 83 B.R. 470, 490 (Bankr.S.D.Ohio 1988) ("The first way [to obtain confirmation of a Chapter 11 plan], which has been referred to as the 'consent' or 'acceptance' method, is to meet all [of the] requirements of § 1129(a), including subsection (a)(8), which provides that all impaired classes of claims or interests must accept the plan." (footnote omitted)). The Court, however, cannot confirm a Chapter 11 plan pursuant to § 1129(a) alone if there exists an impaired class of claims or interests that has not accepted the plan.

In light of the voting results, neither of the Plans can be confirmed based solely on § 1129(a). Three impaired classes did not accept the Trenton Ridge Plan: Class B–2 (Allowed Claim of American Tax Funding) (no votes), Class B–3 (Allowed Claim of PNC) (one rejection) and Class C–1 (All Unsecured Allowed Claims not having priority under § 507 of the Bankruptcy Code, and not included in Class C–2 of the Trenton Plan) (no votes). *See* Certification of Acceptances and Rejections of Plan of Reorganization for Trenton Ridge Investors, LLC (Doc. 157). Two impaired classes did not accept the Coventry Plan: Class B–2 (Allowed Claim of PNC) (one rejection) and Class C–1 (All Unsecured Allowed Claims not having priority under § 507 of the Bankruptcy Code, and not included in Class C–2 of the Coventry Plan) (no votes). *See* Certification of Acceptances and Rejections of Plan of Reorganization for Coventry East Investors, LLC (Doc. 158).

▮ True, with the exception of the classes populated by PNC, the classes that failed to accept the Plans did so as a result of no creditors voting at all rather than their casting ballots rejecting the Plans. But the general rule is that a class cannot be deemed to have accepted a plan if no creditor in the class has voted. *See In re Castaneda*, No. 09–50101, 2009 WL 3756569, at *1 & n. 1 (Bankr.S.D.Tex. Nov. 2, 2009); *In re Vita Corp.*, 358 B.R. 749, 749 (Bankr.C.D.Ill.2007) ("In this Opinion, the Court joins a clear majority of courts in holding that an impaired class that fails to vote to reject a Chapter 11 plan is not deemed to have accepted the plan."), *aff'd*, 380 B.R. 525 (C.D.Ill.2008); *In re Friese*, 103 B.R. 90, 91–92 (Bankr.S.D.N.Y.1989) (same); *In re Townco Realty, Inc.*, 81 B.R. 707, 708 (Bankr.S.D.Fla.1987) (same).

There might be exceptions to the general rule that a class cannot be deemed to have accepted a Chapter 11 plan if no creditor in the class has voted. An impaired class might be deemed to have accepted a plan if no creditor in the class votes and "[d]uring the confirmation hearing, the Bankruptcy Court ruled in open court and on the record that non-voting creditors are deemed to have accepted the Plan for purposes of section 1129[and][t]hat ruling was incorporated into the Plan of Reorganization." *Heins v. Ruti–Sweetwater (In re Sweetwater)*, 57 B.R. 748, 749 (D.Utah 1985), *aff'd*, 836 F.2d 1263 (10th Cir.1988). That, however, did not happen here.

An impaired class in which no creditor votes might also be deemed to have accepted a plan if the plan "adopts a presumption" that impaired classes in which no votes are cast shall be deemed to accept the plan and that "presumption [is] explicit and well advertised, appearing in both the [p]lan and the ... [d]isclosure [s]tatement...." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260 (Bankr.S.D.N.Y. 2007). A deemed acceptance also might be permissible in a case where the acceptance is needed so as to "not let a few small classes in which no vote was cast at all undermine the votes of thousands of other

creditors, with billions in debt[.]" *Id.* at 224 (holding that six classes of claims in which no votes were cast would be deemed to accept the plan where the claims were less than .0005% of the dollar amount of claims that did vote and where the other 30 plan classes, representing in excess of $12 billion in debt, voted to accept the plan).

The Court, however, need not rule on the propriety of such deemed acceptances here for two reasons. First, unlike *Adelphia*, this case is not one where the Court's declining to deem a non-vote to be an acceptance would frustrate the votes of creditors holding the vast majority of claims against the Debtors. Indeed, the creditor holding the vast majority of the Debtors' debt—PNC, which holds in excess of $7.7 million of debt against each of Trenton Ridge and Coventry—has voted to reject the Plans. *Cf. Adelphia*, 368 B.R. at 262–63 ("[T]he prototypical case that has held contrary to the [*Sweetwater*] conclusion has been a very small case in which there is insufficient basis to find creditor assent.... I don't need to decide, and don't now decide, whether a like analysis [permitting deemed acceptance by nonvoting creditors] would apply in a smaller case, where billions of dollars of claims hadn't been voted for and against acceptance of a plan and the nonvoting claims were only a tiny proportion of that amount."). Second, unlike the plan in *Adelphia*, nothing in the Debtors' Plans or disclosure statements provided for a deemed acceptance by creditors who declined to vote or a deemed acceptance by a class in which there are no votes cast. *Cf. Adelphia*, 368 B.R. at 261 ("I think [*Sweetwater*] is rightly decided, especially in a situation like that one (and here) ... where the effect of not voting is announced...."). Here, by contrast, the disclosure statements for each of the Plans states that "[h]olders of claims or inter-

ests, who fail to vote, are not counted as either accepting or rejecting the plan." *See* Doc. 101 at 10; Doc. 103 at 10.

■ If a single vote is cast in a plan class and that vote is to accept the plan, then the class has accepted the plan. Thus, if one vote each had been cast in Trenton Ridge Class B–2, Trenton Ridge Class C–1 and Coventry Class C–1, and each of those votes had been to accept the applicable plan, then the Debtors would have been able to seek confirmation pursuant to § 1129(a) with respect to those classes. This result would have followed from the provision of the Bankruptcy Code under which the determination of whether or not a plan has been accepted by creditors holding the requisite number and amount of allowed claims is made by counting only those creditors that have "accepted or rejected such plan." 11 U.S.C. § 1126(c). Under § 1126(c), "if any creditor in a class votes, any other creditors in that class who fail to vote are entirely disregarded for the purpose of determining whether the class has accepted or rejected the plan ... [and] [n]onvoting creditors are deemed neither to have accepted the plan nor rejected it; they are simply bound by the result produced by those who vote." *Sweetwater*, 57 B.R. at 750. *See also Vita Corp.*, 358 B.R. at 751 ("Congress greased the wheels for the debtor by providing that a class's acceptance is based on actual votes received rather than all claims that make up the class. *See* Section 1126(c). Thus ... a debtor need only obtain a single positive vote in each class."). The disclosure statements accurately explained the operation and effect of § 1126(c), stating that "[s]ection 1126 of the Code defines acceptance of the plan by a class of claims as acceptance by holders of two-thirds (2/3rds) in dollar amount and a majority in number of claims of that class, *but only those who actually*

*vote to accept or reject the plan count in determining such ratios." See* Doc. 101 at 10; Doc. 103 at 10 (emphasis added).

Here, however, because no creditor whose claim was classified in Trenton Ridge Class B–2 and Class C–1 and Coventry Class C–1 voted, and neither the Plans nor the disclosure statements provided that a failure to vote would be deemed an acceptance, the classes in which no creditors cast votes must be deemed to have failed to accept the Plans. Whether as a result of affirmative rejection or as a result of non-voting, PNC and the classes in which no votes were cast are in a position to block the Debtors from achieving confirmation of the Plans under § 1129(a).

**B. Confirmation of Non–Consensual Plans Under Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Code, however, also requires the Court to confirm a non-consensual plan—under § 1129(b)—if the plan meets all of the other requirements of that subsection with respect to each impaired, non-accepting class and if the plan satisfies the applicable requirements of § 1129(a) other than § 1129(a)(8). *See Future Energy*, 83 B.R. at 490. Confirmation of a nonconsensual plan "is commonly known in bankruptcy parlance as a 'cramdown' because the plan is crammed down the throats of the [non-accepting] class(es) of creditors." *Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906 (9th Cir.1993). *See also Future Energy*, 83 B.R. at 490 ("Confirmation under § 1129(b) is referred to as cram-down because the plan is permitted to go into effect over the objections of one or more impaired classes of creditors.").

■ During the Confirmation Hearing, the Debtors requested confirmation of their nonconsensual Plans under § 1129(b). That request was timely. *Cf. Townco Realty*, 81 B.R. at 710 ("In possible recognition that its plan is not entitled to confirmation, this debtor has requested cram down under § 1129(b). It first made this request over a month after the confirmation hearing. Neither the statute nor the rules provide a deadline for such a request, but both due process considerations and common sense suggest that such a request must be made before or at the confirmation hearing."). The Court may confirm non-consensual plans only if it determines that there has been compliance with the applicable requirements of both § 1129(a) and (b). The Court will address those requirements more fully below. Before doing so, however, two preliminary points merit discussion.

**C. The Court's Independent Duty to Determine Compliance with the Bankruptcy Code's Confirmation Standards**

■ First, as PNC points out, the Court has an independent duty to determine compliance with each of the Bankruptcy Code's confirmation requirements. This is true even for those confirmation requirements that are not the subject of an objection. The Court's duty applies to the cramdown requirements of § 1129(b). *See Ala. Dep't of Econ. & Cmty. Affairs v. Ball Healthcare–Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1229 (11th Cir.2011) ("Importantly, the Bankruptcy Code envisions a bankruptcy court exercising an independent duty to ensure that the strictures of § 1129(b) are met with regard to impaired dissenting classes of creditors in a Chapter 11 cram down."); *Fin. Sec. Assurance, Inc. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*, 188 B.R. 799, 805 (E.D.La.1995) ("A bankruptcy court confirming a 'cram-down' Chapter 11 reorganization plan has an indepen-

dent duty to analyze the debtor's plan to determine that it has met all the requirements of the [Bankruptcy] Code...." (footnote omitted)), *aff'd*, 116 F.3d 790 (5th Cir.1997); *In re Young Broad. Inc.*, 430 B.R. 99, 139 (Bankr.S.D.N.Y.2010) ("The Lenders object to confirmation of the Committee Plan on the basis that it violates section 1129(b)(2)(B)(ii) because the Committee has failed to establish that the plan does not 'discriminate unfairly' and is 'fair and equitable.' The Committee responded by arguing that the Lenders waived such claims by not asserting them before the court-imposed deadline and that they have no standing to assert such claims. The Court need not reach the issues of waiver and standing because it has an independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied, even if no objections to confirmation have been made."). The Court's duty also extends to those requirements of § 1129(a) that apply in the context of the confirmation of a cramdown plan. *See Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1299–1300 n. 4 (11th Cir.2001) ("A court must independently satisfy itself that these criteria [of § 1129(a) ] are met."); *In re Mayslake Village–Plainfield Campus, Inc.*, 441 B.R.

309, 316 (Bankr.N.D.Ill.2010) ("[R]egardless of whether an objection to confirmation has been asserted, the court must determine whether the requirements of § 1129(a), and if applicable § 1129(b), have been met."); *Future Energy*, 83 B.R. at 482 n. 21 ("The Court believes that, due to its independent duty to determine that the Proponents have achieved compliance with each of the requirements enumerated in § 1129(a) (and, where applicable, § 1129(b)), the ultimate burden of proof is properly imposed upon the Proponents."). The Court cannot confirm a Chapter 11 plan if its proponent fails to carry its burden of proving that the plan satisfies the applicable confirmation requirements.[3]

### D. The Debtors' Burden of Proof

This brings the Court to the second preliminary consideration, which is the where the burden of proof lies, and the nature of the burden of proof, with respect to the confirmation requirements.

 Courts universally agree that the burden of proof lies with the proponent of the plan, here the Debtors. *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 328 (Bankr.D.Del.2011) ("[T]he Plan Supporters bear the burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code for confirma-

---

**3.** By burden of proof, the Court means burden of persuasion. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) ("The term 'burden of proof' is one of the slipperiest member[s] of the family of legal terms. Part of the confusion surrounding the term arises from the fact that historically, the concept encompassed two distinct burdens: the 'burden of persuasion,' *i.e.*, which party loses if the evidence is closely balanced, and the 'burden of production,' *i.e.*, which party bears the obligation to come forward with the evidence at different points in the proceeding. We note at the outset that this case concerns only the burden of persuasion...." (citations and internal quotation marks omitted)). The burden of

production requires an objecting party such as PNC "to do more than merely raise an objection." *Future Energy*, 83 B.R. at 482 n. 21. "Some evidence in support of the objection must be adduced, or, if the objection is premised upon purely legal grounds, persuasive authority must be offered to support the objection." *Id.* Although it has been held that a creditor objecting to a presumptive cramdown interest rate has the evidentiary burden to demonstrate that a different rate should be applied, *see Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road Devs., L.L.C.)*, 392 B.R. 274, 280 (6th Cir. BAP 2008), as discussed further below, PNC and the Debtors made the interest rate a non-issue by stipulating to the appropriate rate.

tion."); *Future Energy,* 83 B.R. at 481 n. 21 ("It is well-established that the proponents of a Chapter 11 plan bear the burden of proving compliance with the requirements of § 1129(a).").

The more difficult question is the nature of the burden of proof. The question is whether the Court should find in favor of a plan proponent on a factual dispute that bears on the confirmability of a plan if the proponent persuades the Court by a preponderance of the evidence, or rather whether the proponent may prevail only if it convinces the Court under the elevated clear and convincing evidence standard. The parties have not addressed the burden of proof. But the selection of a standard could be outcome determinative where, as here, the Court is being asked to make what it views as exceedingly close calls on certain factual questions. Indeed, some of issues in this case are so nearly in evidentiary balance that the Debtors might be able to carry their burden under the preponderance of the evidence standard, but almost certainly would fail to meet their burden if they were required to establish confirmability of the Plans by clear and convincing evidence. *Cf. Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),* 994 F.2d 1160, 1164 (5th Cir.1993) ("As we view it, however, this is a case in which the plan would not pass a clear and convincing standard, but, as will be discussed below, it was not clearly erroneous for the bankruptcy court to conclude that the plan was feasible and the cramdown fair and equitable under a preponderance standard."). The Court, therefore, will address the burden of proof question at some length before proceeding to consider the merits of the confirmation disputes.

▮ The Court concludes that the better view is that the preponderance of the evidence is the correct standard to apply in the context of the confirmation of a Chapter 11 plan. The question of which standard to apply has spawned a considerable body of case law and decisions on both sides of the issue. The Sixth Circuit Court of Appeals has not weighed in on the issue in the Chapter 11 context. But the Fifth and Ninth Circuits have held that the preponderance of the evidence is the appropriate standard. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship),* 115 F.3d 650, 653 (9th Cir.1997) ("The bankruptcy court must confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence either (1) that the Plan satisfies all [of the] requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b)[.]"); *Briscoe,* 994 F.2d at 1163–65. The Eighth Circuit also has so held, at least in the context of plan feasibility. *See Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.S.B. (In re Danny Thomas Props. II Ltd. P'ship),* 241 F.3d 959, 963 (8th Cir.2001) ("The debtors bear the burden of establishing the feasibility of their plans by a preponderance of the evidence."). No federal court of appeals has held that the clear and convincing standard is the appropriate one to apply in the context of plan confirmation.

The Court finds the analysis of Judge Wisdom in *Briscoe* to be particularly persuasive on this point. His extensive analysis so clearly supports the preponderance of the evidence standard that it is worth quoting at length:

The first question that we need to resolve is the debtor's standard of proof in proving that the [plan of] reorganization is confirmable under § 1129(a) and

whether the fact that this is a § 1129(b) cramdown affects the standard.

The two options are proof by a preponderance of the evidence or by clear and convincing evidence. "Preponderance" means that it is more likely than not. "Clear and convincing" is a higher standard and requires a high probability of success.

. . . .

The United States Supreme Court has on several occasions discussed when particular standards of proof are applicable. Chief Justice Burger in *Addington v. Texas* [441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)] spoke of the different factual settings which prompt a particular standard. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. In such a case the plaintiff's burden of proof is a mere preponderance of the evidence. At the other end of the spectrum is a criminal case. The nature of a criminal proceeding has led our legal system to require that the guilt of the accused be proved beyond a reasonable doubt. Between these two poles is some middle standard. The intermediate standard, which usually employs some combination of the words clear, cogent, unequivocal, and convincing, is less commonly used, but nonetheless is no stranger to the civil law. The Chief Justice noted that this standard had typically been employed in civil cases when the interests at stake are deemed to be more substantial than mere loss of money. He proceeded to cite several cases in which the Supreme Court had used the clear and convincing standard to protect particularly important individual interests. . . .

This case clearly does not fit within any of the above "liberty" categories. The Supreme Court, however, gives fur-

ther guidance in several opinions in which it held that "clear and convincing" was the incorrect standard and that "preponderance" should be used. . . .

In 1991, the Supreme Court in *Grogan v. Garner* [498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755(1991)] reversed the Eighth Circuit which had held that clear and convincing was the creditor's standard of proof to show that a debtor's debt was not dischargeable under 11 U.S.C. § 523(a) because it had been procured by fraud. The Court ... observed that both the language of the statute and the statutory history were silent as to burden of proof. The Court viewed this silence as inconsistent with the view that Congress intended to require a special, heightened standard of proof. Moreover, the Court examined the conflicting interests and concluded that proof by a preponderance of the evidence would reflect a fair balance between the conflicting interests.

... In this case, both § 1129 and the legislative history are silent as to the burden of proof. This case is solely about money. There are not even any quasi-liberty interests at stake. . . . The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.

*Briscoe*, 994 F.2d at 1163–65 (citations, internal quotation marks and footnotes omitted).

In other words, as *Briscoe* makes clear, Supreme Court precedent—including in the bankruptcy context—is clear that, when, as here, a dispute is essentially a monetary one that does not implicate individual liberty concerns, and when neither the language of the governing statutory

provision nor its legislative history suggest that Congress intended the imposition of a higher burden of proof, then the party who has the burden need meet it by only a preponderance of the evidence. Prior to *Briscoe,* courts more frequently applied the clear and convincing evidence standard than they do today. *See Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.),* 166 B.R. 428, 432 (C.D.Cal.1993) (collecting cases applying the clear and convincing evidence standard prior to *Briscoe* ). But, "persuaded by *Briscoe's* reasoning[,]" the *Monarch Beach* court held that the preponderance of the evidence was the appropriate standard to use in the confirmation context. *Id.* at 432. *See also In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 937 (Bankr.S.D.N.Y.1994) ("I find the Fifth Circuit's analysis persuasive and conclude that a plan proponent must demonstrate that its plan satisfies section 1129(b) by a preponderance of the evidence."). A few courts continue to apply the clear and convincing evidence standard post-*Briscoe. See, e.g., In re New Midland Plaza Assocs.,* 247 B.R. 877, 883 (Bankr.S.D.Fla. 2000) ("The Court respectfully disagrees with the analysis in *Briscoe* and has applied here the higher clear and convincing standard to determine whether the Debtor has met its burden of proof regarding the elements of § 1129(a) and (b)[.]"). A majority of courts, however, apply the preponderance of the evidence standard. *See, e.g., In re 20 Bayard Views, LLC,* 445 B.R. 83, 93–94 (Bankr.E.D.N.Y.2011) (citing *Briscoe* for the proposition that "[a]s the proponent of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code Section 1129 has been met"); *Young Broad. Inc.,* 430 B.R. at 128 ("The proponent of a proposed plan bears the burden of proving essential elements of confirma-

tion by a preponderance of the evidence."); *In re Chemtura Corp.,* 439 B.R. 561, 608 (Bankr.S.D.N.Y.2010) (stating in the context of the good faith requirement of § 1129(a)(3) that "[t]he proponent of confirmation bears the burden of proof by a preponderance of the evidence").

The preponderance of the evidence standard also applies in the context of cramdown of dissenting classes of claims of unsecured creditors, such as those that did not accept the Plans. *See In re Dow Corning Corp.,* 244 B.R. 705, 710 (Bankr. E.D.Mich.1999) (holding that preponderance of the evidence is the appropriate standard of proof in a cramdown of dissenting unsecured creditor classes under § 1129(b)), *aff'd,* 255 B.R. 445 (E.D.Mich. 2000). And the preponderance of the evidence standard applies equally in the context of a cramdown of the claims of secured creditors. *See Briscoe,* 994 F.2d at 1165 (applying the preponderance of evidence standard in the context of a cramdown of a secured claim); *Ambanc,* 115 F.3d at 653 ("The bankruptcy court must confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence either (1) that the Plan satisfies all [of the applicable] requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b)...."); *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms),* 177 B.R. 648, 654–55 (9th Cir. BAP 1994) (holding that preponderance of the evidence is the appropriate standard of proof in a cramdown over a secured creditor under § 1129(b)), *aff'd,* 85 F.3d 1415 (9th Cir.1996); *Monarch Beach,* 166 B.R. at 432 (same); *In re Bryant,* 439

B.R. 724, 746 (Bankr.E.D.Ark.2010) (same).[4]

## E. Application of the Confirmation Requirements

With those preliminary considerations in mind, the Court turns to the confirmation requirements applicable in this case. The Debtors may effectuate a cramdown under § 1129(b), if at all, only if they can meet the applicable requirements of § 1129(a), so the Court will begin its analysis with the requirements of the latter subsection. In an exercise of its independent duty to determine compliance with the confirmation requirements, the Court will discuss each of the requirements that applies regardless of whether PNC addressed the requirement in its objections.[5]

### 1. Applicable Requirements of Section 1129(a)

#### a. Section 1129(a)(1): Plan's Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) requires that a plan comply with the applicable provisions of the Bankruptcy Code. The "legislative his-tory of subsection 1129(a)(1) suggests that Congress intended the phrase 'applicable provisions' in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans ... such as section 1122 and 1123, *governing classification [of claims] and contents of plan[s]*." *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 648–49 (2d Cir.1988) (quoting S.Rep. No. 95–989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912). *See also 20 Bayard Views*, 445 B.R. at 94 ("Courts interpret th[e] language [of § 1129(a)(1) ] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.").

#### i. Section 1122: Classification

PNC contends that the Debtors have "created questionable classes of creditors that run afoul of the Bankruptcy Code[.]" PNC Trenton Ridge Obj. at 3; PNC Coventry Obj. at 3. Section 1122 governs the classification of claims and interests. With the exception of relatively small unsecured claims separately classified for administrative convenience (the Plans do not provide

---

4. The Court notes that a cramdown alters the secured creditor's rights but does not "result in a complete destruction of the property right of the secured party," *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), and therefore does not implicate the Takings Clause of the Fifth Amendment. *See Briscoe*, 994 F.2d at 1165 ("It is correct, of course, as Justice Brandeis noted during the depression in a case involving the significant alteration of farm mortgagees' rights, that the Bankruptcy laws are subject to the Takings clause. The [Bankruptcy] Code, however, has been the primary source of the creditors' protections not the Fifth Amendment. Congress provides protections for creditors, and in many instances it allows debtors to impinge on creditor's state law rights. Bankruptcy frequently rewrites the secured creditor's state law bargain." (footnote omitted)). Thus, the Court concludes that a clear and convincing evi-dence standard need not be applied in the cramdown context—even when the debtor seeks cramdown with respect to the claims of secured creditors. *Cf. In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 n. 15 (D.Del. 2006) (raising the issue, but declining to decide whether the preponderance of the evidence standard would apply in the context of the cramdown of secured creditors' claims).

5. Certain requirements do not apply to the Plans at all. The subsections of § 1129(a) that do not apply here are (a)(6) (relating to rates of the debtor regulated by a governmental regulatory commission), (a)(13) (relating to retiree benefits), (a)(14) (relating to domestic support obligations), (a)(15) (relating to cases of individual debtors) and (a)(16) (relating to transfers by a debtor that is not a moneyed, business or commercial corporation or trust).

for any), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Having conducted its own independent review of the Debtors' classification of claims, the Court finds no violation of § 1122(a). Here, each class includes only substantially similar claims and interests.

■ PNC, however, raises two classification issues. *See* PNC Trenton Ridge Br. at 18; PNC Conventry Br. at 17–18 ("Debtor's Plan cavalierly provides significantly better treatment for the noteholder[s] as compared to other general unsecured creditors. Such an overt act of gerrymandering should not be tolerated. In addition, the Plan attempts to create a class of impaired unsecured creditors to assist in the confirmation process. Specifically, Class A–2 of the Plan purports to include unsecured creditors that are owed deposits. The creation of this class is a clear effort to give the Debtor a better chance of having an impaired class that accepts the Plan.... The mere fact that a tenant made a deposit does not create a claim for bankruptcy purposes."). In other words, PNC appears to believe that (1) the tenants do not have claims at all based merely on their providing security deposits to the Debtors and (2) the claims of Member Noteholders, being unsecured claims, are substantially similar to, and should be placed in the same class as, the general unsecured claims.[6]

The Court finds neither of PNC's objections to be persuasive. In the context of

arguably similar claims being included in different classes, the Sixth Circuit has explained the proper analysis to be conducted under § 1122(a) as follows:

> The statute, by its express language, only addresses the problem of dissimilar claims being included in the same class. It does not address the correlative problem—the one we face here—of similar claims being put in different classes. Some courts have seized upon this omission, and have held that the Code does not require a debtor to put similar claims in the same class.
>
> . . . .
>
> In this case, U.S. Truck is using its classification powers to segregate dissenting (impaired) creditors from assenting (impaired) creditors (by putting the dissenters into a class or classes by themselves) and, thus, it is assured that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court. We agree with the Teamsters Committee that there must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.
>
> . . . .

6. As discussed further below, in order for a plan to be confirmed when (as is almost always the case) there is an impaired class of claims, at least one such class must have accepted the plan (determined without including any acceptances by insiders). *See* 11 U.S.C. § 1129(a)(10). Thus, classification-based objections to confirmation often will

allege that the debtor has classified claims in a way that the debtor believes will ensure that there is at least one impaired accepting class. Here, PNC alleges that the Debtors have done just that and that this is evidence of the Debtors' purported lack of good faith. The Court will address PNC's good faith objections below.

... [W]e do find one common theme in the prior case law that Congress incorporated into section 1122. In those pre-Code cases, the lower courts were given broad discretion to determine proper classification according to the factual circumstances of each individual case. We also find some guidance in two cases that considered the need to adjust the classification of creditors to account for differing postures and interests.

. . . .

We find that the rationale of these two cases applies here. The District Court noted three important ways in which the interests of the Teamsters Committee differ substantially from those of the other impaired creditors. Because of these differences, the Teamsters Committee has a different stake in the future viability of the reorganized company and has alternative means at its disposal for protecting its claim.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.),* 800 F.2d 581, 585–87 (6th Cir. 1986) (citations and footnotes omitted).

As in *U.S. Truck,* the claims that PNC contends should have been classified together are all unsecured and the allegation is that the Debtors separately classified the unsecured claims to ensure that at least one impaired class of claims would vote to accept each of the Plans. But just as the Sixth Circuit found that the interests of the Teamsters Committee in *U.S. Truck* differed substantially enough from the interests of the other impaired unsecured creditors that they could be placed into separate classes, the Court concludes that the interests of the tenants and the Members Noteholders are sufficiently different from the interests of the other unsecured creditors to warrant separate classification. *See Barakat v. Life Ins.*

*Co. of Va. (In re Barakat),* 99 F.3d 1520, 1527 (9th Cir.1996) ("As a threshold matter, appellee argues that the separate classification by Debtor of the Class 4 unsecured tenant deposit claims violates § 1122. Appellee raised this objection before the bankruptcy court, but neither the bankruptcy court nor the district court addressed the classification issue. It appears that both courts assumed that separate classification was proper. In any event, we find that the bankruptcy court did not err in separately classifying this class. The likely basis for the separate classification, as contended by Debtor below, was that such claims were legally different from the other unsecured claims."); *In re DeLuca,* No. 95–11924–AM, 1996 WL 910908, at *9 (Bankr. E.D.Va. Apr. 12, 1996) ("In the present case, there are logical reasons for classifying the $250,000 unsecured claim separately from the other unsecured claims.... [A]s a limited partner [the noteholder's] motivation in lending to the debtor is presumably very different from the ordinary trade creditor extending credit, and it is reasonable to assume that the holder of the $250,000 note would have interests not shared by the trade creditors."). *See also In re Jersey City Med. Ctr.,* 817 F.2d 1055, 1061 (3d Cir.1987) (approving the separate classification of unsecured claims based on the different interest of the holders of the claims).

In *U.S. Truck,* the Sixth Circuit noted that "[i]n those cases where the courts have held that, as a general rule, similar claims need not be classified together, the debtor had not created the separate classes for the purpose of assuring acceptance," *see U.S. Truck,* 800 F.2d at 586 n. 9, making clear that the concern the Sixth Circuit was addressing was the potential for gerrymandering. *See In re Dow Corning Corp.,* 255 B.R. 445, 496 (E.D.Mich.

2000) ("It appears that the Sixth Circuit's main concern [in *U.S. Truck* ] was that the classification of claims not to be used to gerrymander votes or that unfair dealing and breach of fiduciary obligations occurred in the classification of claims."). But here the number and dollar amount of the various types of claims makes clear that a class comprised of general unsecured creditors and the Member Noteholders grouped together (which is how PNC suggests they should have been classified) would have voted to accept the Plans, and it appears reasonable to conclude that the Debtors would have anticipated such a vote.

The artificial impairment argument lacks merit for the additional reason that impaired Class B–1 (Allowed Secured Claims of the County Treasurer) voted to accept both Plans, thereby independently satisfying the requirement of § 1129(a)(10), and there is no reason to believe that the claim in that class, which is a secured claim of a taxing authority, should have been included in the same class as unsecured claims. Accordingly, the Court finds that the Debtors did not attempt to gerrymander the vote. For all of the reasons set forth above, the Court concludes that the Debtors have demonstrated by a preponderance of the evidence that the Plans comply with the classification scheme established by § 1122(a) of the Bankruptcy Code.

**ii. Section 1123: Contents of the Plan**

 Section 1123(a)(1) governs the contents of a plan. In order to be confirmed, a plan must, among other things: designate certain classes of claims and interests, *see* § 1123(a)(1); specify which classes are unimpaired and which are impaired, *see* § 1123(a)(2) & (3); and provide the same treatment for each claim or interest of a particular class (unless the holder of a particular claim or interest has agreed to a less favorable treatment). *See* 11 U.S.C. § 1123(a)(4). Based on its review of the Plans, the Court concludes that the Debtors have established by a preponderance of the evidence that the Plans satisfy the requirements set forth in the first four subsections of § 1123(a). The fifth requirement of § 1123(a) is that the plan "provide adequate means for the plan's implementation. . . ." 11 U.S.C. § 1123(a)(5). "Generally, this is a requirement that the debtor must provide some method for repayment of debts." *In re A & F Elec. Co.,* No. 07–01377, 2007 WL 5582063, at *9 (Bankr.M.D.Tenn. Aug. 22, 2007). The Debtors certainly have provided methods for the repayments of their debts. But there are serious questions as to whether those methods are adequate—including whether Trenton Ridge will be able to make the cash call—and the Court could address those questions here in determining whether the Plans comply with § 1123(a)(5). *See In re Valley Park Grp., Inc.,* 96 B.R. 16, 23 (Bankr.N.D.N.Y.1989) ("The Plan's rosy sales projections pursuant to the revised building plan are suspect. . . . [T]he Court can only conclude that the Plan is a visionary scheme that does not provide adequate means for implementation pursuant to Code § 1123(a)(5)."). The Court, however, will analyze those issues in the section of this opinion dealing with the Plans' feasibility. *Cf. In re Draiman,* 450 B.R. 777, 795 (Bankr.N.D.Ill.2011) ("[T]he Debtor's ability to generate income is best addressed under the feasibility requirement of § 1129(a)(11).").

 Section 1123(a)(6) of the Bankruptcy Code "prohibits the issuance of *new* nonvoting securities." *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 787 F.2d 1352, 1361 (9th Cir.1986). Both of the Plans provide that "[a]s of the Effective Date the Operating Agreement of Debtor

shall be modified and amended to the extent required by § 1123(a)(6) of the Code" and that "[a]ll Reorganized Debtor Member Interests issued hereunder to holders of claims in Class C–2 hereof shall be subject to such Operating Agreement, as amended." Doc. 100 at 14; Doc. 102 at 13–14. The Court interprets these provisions of the Plans to mean that the Debtors will amend their operating agreements to include a provision "prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes...." 11 U.S.C. § 1123(a)(6). Thus, the Court concludes that the Debtors have established by a preponderance of the evidence that the Plans satisfy the requirement set forth in § 1123(a)(6).[7]

Section 1123(a)(7) of the Bankruptcy Code requires that a Chapter 11 plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee[.]" 11 U.S.C. § 1123(a)(7). There has been no suggestion that this requirement has not been met, and the Court concludes based on its independent review that the Debtors have established by a preponderance of the evidence that the Plans satisfy the requirements of § 1123(a)(7).

**b. Section 1129(a)(2): Proponent's Compliance with Applicable Provisions of the Bankruptcy Code**

 Section 1129(a)(2) of the Bankruptcy Code requires the Court to find that "[t]he proponent of the plan [has]

complie[d] with the applicable provisions of" the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). "Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)." *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson),* 141 B.R. 715, 719 (Bankr.E.D.Cal.1992). *See also In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr.E.D.Mo.1995) ("The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan."); *In re Texaco Inc.,* 84 B.R. 893, 906–07 (Bankr.S.D.N.Y.1988) (same). The Court previously approved the Debtors' disclosure statements, and the Debtors complied with the Court's order regarding service of the disclosure statement and solicitation of votes. The Court accordingly concludes that the Debtors have established by a preponderance of the evidence that they have complied with the applicable provisions of the Bankruptcy Code, including the provisions regarding adequacy of their disclosure statements and provisions governing notice, disclosure and solicitation in connection with the Plans.

**c. Section 1129(a)(3): Good Faith**

With the exception of certain classification issues raised by PNC, the other points the Court has discussed thus far were addressed as a result of the Court's independent duty to ensure compliance with all of the confirmation requirements. The Court next turns to an issue raised by

---

**7.** By its express terms, § 1123(a)(6) might appear to apply only "if the debtor is a corporation," 11 U.S.C. § 1123(a)(6), and here the Debtors are limited liability companies. Section 1123(a)(6), however, has been applied to debtors that are limited liability companies. *See, e.g., 20 Bayard Views,* 445 B.R. at 95.

PNC—the Debtors' purported lack of good faith in proposing the Plans.

Under § 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). As an initial matter, the Court concludes that the Plans have not been proposed by any means forbidden by law. No one has suggested otherwise and, leaving that aspect of § 1129(a)(3) aside, the Court will focus on the requirement of good faith.

■ The Bankruptcy Code does not define the term "good faith," and the Sixth Circuit has not defined it for purposes of § 1129(a)(3). But "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984). Several federal courts of appeals have applied that definition or some variation of it. *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir.2004) ("For purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (internal quotation marks omitted)); *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002); *McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir.1995); *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir.1987); *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985); *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1459–60 (10th Cir.1985); *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir.1984) ("This court has defined the good faith standard in the bankruptcy context as requiring a showing that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." (internal quotation marks omitted)); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 764 (1st Cir.1983). *See also Future Energy*, 83 B.R. at 486. In assessing whether a plan complies with § 1129(a)(3)'s good faith standard, a bankruptcy court must examine the totality of the circumstances. *See, e.g., Sylmar Plaza*, 314 F.3d at 1074; *Future Energy*, 83 B.R. at 486.

Although the Sixth Circuit has not defined good faith in the Chapter 11 plan confirmation context, it has done so in the context of analyzing a debtor's good faith in proposing a Chapter 13 plan, holding that courts must, based on the totality of the circumstances, determine whether the plan satisfies the purposes underlying Chapter 13:

Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. *The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13:* a sincerely-intended repayment of prepetition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment.

... [C]ourts should take into account the totality of the circumstances confronting a debtor ... when deciding

whether or not to confirm a Chapter 13 plan.

*Metro Emps. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah)*, 836 F.2d 1030, 1033–34 (6th Cir.1988) (emphasis added). Several courts have referenced *Okoreeh–Baah* when analyzing whether Chapter 11 plans were proposed in good faith. *See In re Dow Corning Corp.*, 244 B.R. 673, 675–76 (Bankr.E.D.Mich.1999), *aff'd*, 255 B.R. 445 (E.D.Mich.2000); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 475–76 (Bankr.S.D.Ohio 1994); *In re Gregory Boat Co.*, 144 B.R. 361, 366 n. 1 (Bankr.E.D.Mich.1992) ("There is extensive case law defining good faith in the context of the confirmation of a Chapter 13 plan. . . . [I]n the Chapter 11 plan context . . . it is appropriate to borrow concepts of good faith from the Chapter 13 plan confirmation context[.]" (citations omitted)). That courts would do so makes sense because *Okoreeh–Baah's* holding is consistent with the approach taken by the courts cited above in the Chapter 11 context. In *Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123 (6th Cir.1990), the Sixth Circuit, citing *Okoreeh–Baah*, stated that "[t]his court has suggested a twelve-part test to determine whether a debtor's Chapter 13 plan is proposed in good faith." *Caldwell*, 895 F.2d at 1126. Many of the parts of that 12–part test that were developed to analyze good faith in the Chapter 13 context would not apply in the context of a Chapter 11 plan, and the Court therefore will not apply the test here. Nonetheless, the general principle enunciated in *Okoreeh–Baah*—that the Court must examine the totality of the circumstances to determine whether the plan satisfies the purposes of the particular chapter of the Bankruptcy Code under which the plan is to be confirmed—remains applicable in Chapter 11.

■ Applying *Okoreeh–Baah* and the other decisions discussed above, the Court must determine whether the Plans, given the totality of the Debtors' circumstances, satisfy the purposes underlying Chapter 11. "Two primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims." *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 25 (1st Cir.2007); *Bonner Mall*, 2 F.3d at 916 ("[W]hile the protection of creditors' interests is an important purpose under Chapter 11, the Supreme Court has made clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes.") (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) and *Toibb v. Radloff*, 501 U.S. 157, 164, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (footnote omitted)).

■ The Debtors have explained their reasons for filing the Plans as follows:

Debtors' chapter 11 cases were precipitated by foreclosure proceedings initiated by purported holder of mechanics liens against both Debtors' real estate assets. Ultimately, PNC asserted cross and counter claims in the foreclosure cases and sought the appointment of a receiver, which, with regard to Trenton, was granted by the state court. Debtors' commenced their cases in hopes of effectuating a timely public sale of all their real estate assets under § 363 of the Bankruptcy Code. This strategy changed as PNC balked at the anticipated expense of an auctioneer and the costs of delinquent real estate taxes, and informed the Debtors that they were exploring a sale of their notes. (Confirmation Hr'g Tr. 28–31, July 27, 2010). With no clear direction from PNC as to its desired resolution of these Chapter 11 cases, the Debtors proposed their

respective plans of reorganization, seeking to implement possible restructurings of Debtors' financial obligations to PNC finances by means of a chapter 11 plan. Debtors' Reply at 13. *See also* Tr. I at 29:17–31:11; 42:19–43:18.

In light of the Debtors' explanation set forth above and the evidence supporting it, and considering the provisions of the Plans, the Court concludes that the Debtors have established by a preponderance of the evidence that they filed the Plans as part of efforts to reorganize and to preserve the Debtors' businesses as going concerns. This strongly suggests that the Debtors have proposed the Plans in good faith. *See In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 550 (Bankr.E.D.Tenn. 1997) ("The court is satisfied that the Partners have proposed their plan with a legitimate rehabilitative purpose. Accordingly, the objection to confirmation based on an alleged lack of good faith will be overruled.").

Indeed, PNC itself has stated that it does not question the Debtors' desire to reorganize. Rather, PNC contends that evidence of the Debtors' lack of good faith can be found in their: (1) alleged artificial impairment of certain classes of creditors (*i.e.*, the separate classification of tenant security deposit claims, purportedly for the purpose of increasing the likelihood that there would be an impaired accepting class of creditors for each plan); and (2) purported violations of the absolute priority rule. As previously discussed, the Debtors' classification of claims was not improper under the Bankruptcy Code. The Court therefore rejects the alleged artificial impairment of claims as a basis for finding a lack of good faith. *See id.* at 549–50 ("This court does not find that the Partners' plan was proposed in bad faith. Condor's charge that the Partners have engaged in multiple abuses of the bankruptcy system by reason of the artificial impairment of the unsecured trade debt and gerrymandering of classes is without merit as the court noted that Condor's objections based on these arguments will be overruled."); *In re Beauchesne*, 209 B.R. 266, 275 (Bankr.D.N.H.1997) ("11 U.S.C. § 1129(a)(10) ... literally allows any impairment to qualify, and does not specify a degree of impairment in terms of the magnitude of the impairment or of the claim.... To the extent that the bank argues that the good faith requirement of section 1129(a)(3) could be read to in effect overrule section 1129(a)(10), the Court also rejects that contention. Once it is determined that section 1129(a)(10) is satisfied, it is not appropriate or permissible to use the generalized good faith requirement in section 1129(a)(3) to in effect override that determination."); *In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 611–12 (Bankr.W.D.Tex.1990) ("Heights believes that the creation of an impaired class of security deposit claims was in bad faith.... [T]here is no proscription against security deposit claims being placed in a separate class under a plan.... Heights' objection based on lack of good faith is tenuous, and, accordingly, is overruled.").

Although it is not so clearly stated, perhaps PNC's argument is that evidence of the Debtors' purported lack of good faith can be found in their designating as impaired classes of claims—allowed claims for security deposits—that are not truly impaired. The Court notes that there is case law supporting the view that the tenant security deposit claims are unimpaired. *See Barakat*, 99 F.3d at 1528; *Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Rd. Ltd. P'ship)*, 21 F.3d 477, 484 (2d Cir. 1994); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir.1991). But even if the Court ac-

cepts the premise that the tenants' claims on account of the security deposits are unimpaired—and thus the claims are misclassified under the Plans—this fact, standing alone, would not support a finding of bad faith when the totality of the circumstances are taken into consideration. For that reason—and because other clearly impaired classes have accepted the plan—the Court need not reach the issue of whether the security-deposit claims are impaired.[8]

■ The Court also rejects PNC's absolute-priority argument as a ground for finding that the Debtors lacked good faith in proposing the Plans. As discussed below, the Plans do indeed violate the absolute priority rule with respect to unsecured creditors. That fact, however, is more appropriately addressed as part of the "fair and equitable" analysis required under § 1129(b), and is not an adequate basis for finding that the Debtors failed to propose the Plans in good faith. *See In re Ferch*, 333 B.R. 781, 785 (Bankr.W.D.Tex.2005) ("The good faith requirement of 11 U.S.C. § 1129(a)(3) is, therefore, satisfied. The issue as to the amount of time it will take to pay [the creditor's] claim and the structure of those payments, including the use of excess income from the operation of the Debtor's business by the Debtor for purposes other than payment of creditors' claims is more appropriately the subject of the 'fair and equitable' test. . . .").

■ As previously noted, in analyzing whether a Chapter 11 plan was proposed in good faith, courts look to whether there is a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Madison Hotel Assocs.*, 749 F.2d at 425 (internal quotation mark omitted). That formulation of the test could be read to suggest that good faith can be found only if the plan is feasible. *See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters. Ltd., II)*, 138 B.R. 795, 809 (N.D.Tex.1992) ("The record does not support a finding of objective good faith, because the plan is not feasible."), *rev'd, Briscoe*, 994 F.2d at 1167. Once again, however, the Court concludes that the issue of whether the Plans comply with a particular confirmation standard is best considered under the specific section governing it—in the instance of feasibility, § 1129(a)(11)—not under the more general rubric of good faith. *Cf. Dow Corning*, 244 B.R. at 676 ("[C]ourts frequently do and ought to reject sloppy reliance on good faith to cover all sorts of more specific objections covered by specific confirmation standards.").

■ An argument also could be made that the Debtors might be able to make larger payments to unsecured creditors and therefore pay those creditors' claims more quickly if the Debtors had obtained a cash infusion from their Member Noteholders in order to fund the plan payments

---

**8.** Several other confirmation requirements relate to impairment, but those requirements also do not necessitate the Court's considering whether the security deposit claims are impaired. As discussed below, § 1129(a)(7) requires that each holder of a claim or interest in an impaired class must accept the plan or, if not, the debtor must satisfy the best interests test but, as discussed below, the Debtors have satisfied the best interests test for all classes. Under § 1129(a)(10), if there is an impaired class of claims, at least one class of impaired claims must have accepted the plan (without considering acceptances by insiders), but that requirement also is satisfied without consideration of the classes made up of the security deposit claims. Finally, even if the classes consisting of security-deposit claims are impaired, the Debtors would not need to meet the cramdown requirements with respect to them because those classes have accepted the Plans.

to unsecured creditors, and that their failure to do so evinces a lack of good faith. *Cf. In re Kemp,* 134 B.R. 413, 415 (Bankr. E.D.Cal.1991) (holding that the debtor's Chapter 11 plan was not proposed in good faith based on its finding that "the debtor is capable of making payments substantially higher than he has offered in his Plan"). Indeed, PNC contends that the Plans violate the absolute priority rule because the Member Noteholders are receiving better treatment than other unsecured creditors in that the Member Noteholders are receiving equity in the reorganized Debtors but are not contributing new value, and that this is evidence of the Debtors' lack of good faith. The failure of the equity holders to contribute new value, however, does not establish bad faith. *See Corestates Bank, N.A. v. United Chem. Techs., Inc.,* 202 B.R. 33, 57 (E.D.Pa.1996) ("CoreStates suggests that the Bankruptcy Court erred in determining that United's Plan was ... proposed in [good] faith.... The Bankruptcy Court assessed CoreStates' bad faith argument in the context of shareholder contributions. CoreStates' objections stated that the Plan was not filed in good faith because it did not obligate United's shareholders to make a financial contribution. The Bankruptcy Court disagreed, noting the general absence of any requirement that shareholders fund a plan.... The Court's examination of the record in the instant case reveals no evidence whatsoever to contradict the Bankruptcy Court's findings regarding good faith."); *Crestar Bank v. Walker (In re Walker),* 165 B.R. 994, 1001 n. 3 (E.D.Va.1994) ("[T]he ability of the debtor to make higher payments, standing alone, does not preclude a finding of good faith.").

 Moreover, whether the Plans provide for payments to creditors required by the Bankruptcy Code is more appropriately addressed under other sections of the Bankruptcy Code (including § 1129(a)(7) & (a)(9) and § 1129(b)), and the Court will do so below. *See In re Ridgewood Apartments of DeKalb Cnty., Ltd.,* 183 B.R. 784, 789 (Bankr.S.D.Ohio 1995) ("Fannie Mae presented no evidence to support its claim of lack of good faith or from which the Court could infer that the Plan is not intended by the Debtor as an effort to reorganize. Fannie Mae's arguments regarding specific plan terms are better addressed under particular requirements for confirmation and, specifically, under the 'fair and equitable' requirements of 11 U.S.C. § 1129(b)."). Indeed, if it were to do otherwise, the Court likely would find a lack of good faith in every case where a plan failed to satisfy one or more of the specifically enumerated confirmation requirements set forth in § 1129(a) and (b) other than § 1129(a)(3)'s good faith standard. In short, "[a] plan may not be the one that the creditors would themselves design and *may indeed not be confirmed* and yet still pass the good faith requirement." *Briscoe,* 994 F.2d at 1167 (emphasis added).

Considering the totality of the circumstances, the Court concludes that the Debtors have carried their burden of proving that they proposed the Plans in good faith and not by any means forbidden by law. In sum, the Court concludes that the requirements of § 1129(a)(3) have been met.

### d. Section 1129(a)(4): Payments Subject to Court Approval

 Under § 1129(a)(4), the Court shall confirm a plan, if at all, only if:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been ap-

proved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). " 'This subsection mandates full disclosure of all payments or promises of payment for services, costs, and expenses in connection with the case, and subjects the reasonableness of such payments to the scrutiny and approval of the court.' " *Future Energy*, 83 B.R. at 488 (quoting 5 *Collier on Bankruptcy* § 1129.02[4] at 1129–28 (15th ed. 1987)). It was not necessary for the Debtors to specifically provide for the Court's consideration and approval of professional fee applications in order for the Court to find compliance with § 1129(a)(4). *See id.* ("[The] contention that the Plan must contain a provision stating that all relevant payments will be subject to Court approval [is] without merit. Court approval of payments for services and expenses is governed by various Code provisions—*e.g.*, §§ 328, 329, 330, 331 and 503(b)—and need not be explicitly provided for in a Chapter 11 plan. Hence, the Court finds that the Proponents have achieved compliance with § 1129(a)(4)."). There has been no suggestion that the requirements of § 1129(a)(4) have not been met here, and the Court concludes based on its independent review that they have been satisfied. Accordingly, the Court finds that the Plans comply with § 1129(a)(4).

### e. Section 1129(a)(5): Disclosure of Identity and Affiliations of Certain Individuals

■ Under § 1129(a)(5), the Court shall confirm a plan, if at all, only if: (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. § 1129(a)(5). The disclosure statements for the Plans state that Davis and Shorr will continue as co-managers of the Debtors post-confirmation. Thus, the Court concludes that the Debtors have complied with § 1129(a)(5).

### f. Section 1129(a)(7): The Best–Interests–of–Creditors Test

■ Section 1129(a)(7) provides in pertinent part as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7)(A). Commonly known as the "best-interests-of-creditors test," this section "requires that with respect to each impaired class, the class must unanimously accept the plan or each holder of a claim within the class must

receive under the plan at least what such holder would receive under a Chapter 7 liquidation." *Future Energy,* 83 B.R. at 489.

The County Treasurer voted to accept the Plans, resulting in a unanimous acceptance in the secured classes in which it is classified. The best-interests-of-creditors test, therefore, does not apply to the County Treasurer.

 Based on the liquidation analysis presented by each of the Debtors, the Court concludes that each holder of a claim in the other impaired classes that did not unanimously accept the Plans (other than PNC, which will be considered separately below) would receive or retain under the Plans at least as much as those creditors would receive in a Chapter 7 liquidation. That includes ATF, which according to Trenton Ridge's liquidation analysis would receive a 100% distribution in a liquidation, but also is receiving under the Trenton Ridge Plan full payment on its secured claim over time together with the interest required by applicable non-bankruptcy law. *See United Chem. Techs.,* 202 B.R. at 56 ("[The debtor] attached a liquidation analysis suggesting that liquidation would produce ... more than enough to satisfy CoreStates' claim.... Under the Plan, however, CoreStates still receives full payment of its claim, albeit over an extended period of time. Furthermore, the Bankruptcy Court made specific findings of fact regarding the Plan's interest rates and a valuation of [the lender's] collateral and concluded that the Plan provides CoreStates, within the context of § 1129(b)(2)(A)(i)(II), with deferred cash payments totaling at least the present value of its claim. The Bankruptcy Court's findings with respect to § 1129(a)(7), therefore, were not clearly erroneous.").

 The best interests test also is met with respect to the unsecured creditors in the various unsecured classes. The Debtors' liquidation analyses state that each unsecured creditor would receive a 0% distribution on its claim, and the evidence supports that statement. *See* Tr. I at 44:21–46:14. By contrast, under the Plans, unsecured creditors are slated to receive some distribution. Thus, the Plans clearly satisfy the best interests test with respect to unsecured creditors. *See In re Unbreakable Nation Co.,* 437 B.R. 189, 201 (Bankr.E.D.Pa.2010) ("[T]he Court finds that there is ample evidence that the claimants [who would receive $100,000 in the aggregate under the plan] will receive a better payout through the Plan than if this case were converted to Chapter 7. If this case were converted ... the unsecured creditors would then receive *no payment* on their debts."). That includes the creditors in the general unsecured class (none of whom voted on the Plans) and any holders of security-deposit claims and Member Noteholder claims who did not vote to accept the Plans.

 That leaves only the claims of PNC, which has made the § 1111(b) election. With respect to a creditor that has made such an election, § 1129(a)(7) provides as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

(7) With respect to each impaired class of claims or interests—

. . . .

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such hold-

er's interest in the estate's interest in the property that secures such claims. 11 U.S.C. § 1129(a)(7)(B). Under this provision, " 'the present value of such payments [to the § 1111(b)(2) elector] need only equal the value of the secured creditor's interest in its collateral.' " *Dewsnup v. Timm*, 502 U.S. 410, 430 n. 3, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting) (quoting 5 *Collier on Bankruptcy* ¶ 1111.02, at 1111–25 to 1111–26, n. 23 (15th ed. 1990)). PNC has not argued that the present value of the payments that would be made to it under the Plans would be less than the value of its interest in its collateral. To the contrary, the Court inquired during the Confirmation Hearing whether PNC was stipulating that "the stream of payments that are going to be made provide the present value of the secured claim," Tr. II at 133:1–133:3, and PNC's counsel stated that "there's not a dispute about that, Your Honor." *Id.* at 133:11–133:12. Because the value of a secured claim is equal to the value of the secured creditor's interest in the debtor's interest in the collateral, *see* 11 U.S.C. § 506(a), PNC's stipulation is consistent with its decision not to assert an objection to the Plans pursuant to § 1129(a)(7)(B), and the Court finds that the Debtors have met the requirement imposed by that subsection.

In sum, the Court concludes that the Debtors have demonstrated by a preponderance of the evidence that the Plans comply with § 1129(a)(7) of the Bankruptcy Code.

### g. Sections 1129(a)(8)–(9) and (a)(12)

As previously discussed, neither Plan was accepted by each impaired class. Thus, the Debtors have not met the requirement set forth in § 1129(a)(8) of unanimous acceptance by impaired classes.

The Plans, however, do satisfy § 1129(a)(9), which requires specified treatment of certain claims "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim[.]" 11 U.S.C. § 1129(a)(9). There are four subsections of 11 U.S.C. § 1129(a)(9), and each is relevant here.

First, the requirement that "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title[9], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim[,]" 11 U.S.C. § 1129(a)(9)(A), is satisfied by the provisions of the plan under which "All Allowed Claims of a kind specified in § 507(a)(2) of the Code incurred in the Case … shall be paid by Debtor in full upon the later of allowance by the Court, the Effective Date, or such later date and on such terms as may be agreed upon by Debtor and the claimant." Doc. 100 at 10; Doc. 102 at 9–10.

The only classes that include claims falling within any of the categories of claims referenced in § 1129(a)(9)(B) are the security-deposit claims, and the holders of those claims are receiving the treatment required by that subsection.[10]

9. Claims specified in § 507(a)(2) include "administrative expenses allowed under section 503(b)[,]" including, among other expenses, "compensation and reimbursement awarded under section 330(a)" of the Bankruptcy Code, which governs compensation of professionals. Section 507(a)(3) grants a priority to "unsecured claims allowed under section 502(f)[,]" which in turn relates to certain claims arising "in an involuntary case." 11 U.S.C. § 502(f). Thus, § 507(a)(3) does not apply here.

10. Section 1129(9)(B) provides for particular treatment of classes of claims "of a kind specified in[,]" among other sections, § 507(a)(7) of the Bankruptcy Code. Section 507(a)(7) grants a priority to the holders of certain

Section 1129(a)(9)(C) requires a particular treatment of unsecured claims of governmental units having priority under § 507(a)(8) of the Bankruptcy Code, and the Plans provide such claims the required treatment.

The final subsection of § 1129(a)(9) relates to "secured claim[s] which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim[.]" 11 U.S.C. § 1129(a)(9)(D). The only creditor potentially holding a claim of that description, the County Treasurer, has voted to accept both of the Plans.

For all of the reasons set forth above, the Court concludes that the Debtors have demonstrated by a preponderance of the evidence that the Plans comply with § 1129(a)(9) of the Bankruptcy Code.

Under § 1129(a)(12), "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan [must] provide[ ] for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12). The Plans provide for the payment of fees payable under § 1930 of title 28 "in full upon the later of allowance by the Court, the Effective Date, or such later date and on such terms as may be agreed upon by Debtor and the claimant." Doc. 100 at 10; Doc. 102 at 9–10. Thus, the Plans comply with § 1129(a)(12).

### h. Section 1129(a)(10): At Least One Impaired Accepting Class

Under § 1129(a)(10), "[i]f a class of claims is impaired under the plan," then it must be the case that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). One court has explained the purpose of § 1129(a)(10) as follows:

> Section 1129(a)(10) operates as a statutory gatekeeper barring access to cramdown where there is absent even one impaired class accepting the plan. Cramdown is a powerful remedy available to plan proponents under which dissenting classes are compelled to rely on difficult judicial valuations, judgments, and determinations. The policy underlying Section 1129(a)(10) is that before embarking upon the tortuous path of cramdown and compelling the target of cramdown to shoulder the risks of error necessarily associated with a forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan.

*One Times Square Assocs. Ltd. P'ship v. Banque Nationale de Paris (In re One Times Square Assocs. Ltd. P'ship)*, 165 B.R. 773, 776–77 (S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2d Cir.1994) (quoting *In re 266 Washington Assocs.*, 141 B.R. 275, 287 (Bankr.E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y.1992)). Given the importance of this confirmation requirement, the Court will not begin and end its analysis merely by noting that at least two classes—Class B–1 (Allowed Secured Claim of the County Treasurer) and Class C–2 (All Unsecured Claims of Member Noteholders)—voted to accept each of the Plans. Rather, the Court will analyze whether those classes

deposit claims: "Seventh, allowed unsecured claims of individuals, to the extent of[, at the time the Debtors' cases were filed,] $2,425 ... arising from the deposit, before the commencement of the case, of money in connec-tion with the ... lease, or rental of property ... for the personal, family, or household use of such individuals, that were not delivered or provided." 11 U.S.C. § 507(a)(7).

should count for the purpose of satisfying the requirement of § 1129(a)(10).

There is no doubt that the claims held by the Member Noteholders are impaired. PNC, however, has questioned whether the class of Member Noteholders should count as a class for the purpose of § 1129(a)(10) in light of the phrase "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The Court concludes that Class C–2 should count as an accepting impaired class. Among the Member Noteholders, the only possible insider is Vivian Davis. She is married to Davis, a co-managing member of the Debtors. As a managing member, Davis is an insider of the Debtors. *See Longview Aluminum, L.L.C. v. Brandt*, 431 B.R. 193, 196 (N.D.Ill.2010); *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 31 (Bankr. D.Mass.2011). And, as his relative, Mrs. Davis also is an insider. *Cf.* 11 U.S.C. § 101(31)(B)(vi) (making a relative of a director of a corporation an insider). The other Member Noteholders, however, have no such familial relationship to Davis or Shorr. In addition, none of the other Member Noteholders serve in any capacity that would make them insiders as defined in § 101(31) of the Bankruptcy Code. None of the Member Noteholders individually has control over the Debtors such that any one of them would be an insider pursuant to § 101(3 l)(B)(iii). Indeed, PNC stipulated that the interests owned by each of the Member Noteholders individually is insufficient to provide any one of them any sort of control over the day-to-day operations of the Debtors. The Court finds that no single Member

Noteholder exercises such authority, and that they are not insiders based on any alleged control exercised by them collectively. *See In re E. Maine Elec. Coop., Inc.*, 125 B.R. 329, 335 (Bankr.D.Me.1991) ("Although, in the collective sense, the members control the cooperative, no individual member is 'in control' of EMEC. Thus, the members are not insiders under the Code's definition and, were this plan to be voted upon, classes of claims including those of members could be counted toward satisfying the requirements of § 1129(a)(10) that one impaired, non-insider class accept it." (footnote omitted)). Although "the Seventh Circuit has indicated that [l]egislative history suggests that, in addition to the individuals and entities actually named, the term also encompasses anyone with a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor[,]" *Longview*, 431 B.R. at 196 (internal quotation marks omitted), and the Court has no reason to believe that the Sixth Circuit would not follow that approach,[11] the Court also received no evidence establishing that the Member Noteholders have such a sufficiently close relationship with the Debtors.

Given that no Member Noteholder voted to reject the Plans, as noted above, the Debtors would have needed only a single vote by a Member Noteholder (other than Mrs. Davis) in favor of the Plan for the Member Noteholder class to have accepted the Plan. In fact, each of the Member Noteholders that voted on the Plans voted to accept them. With the exception of Mrs. Davis, the Member Noteholders are

---

11. *See Congrove v. McDonald's Corp. (In re Congrove)*, 330 B.R. 880 (table), No. 04–8049, 2005 WL 2089856, at *7 (table) (B.A.P. 6th Cir. Aug. 31, 2005) ("The term insider includes anyone with a sufficiently close rela-

tionship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." (internal quotation marks omitted)), *aff'd*, 222 Fed.Appx. 450 (6th Cir. 2007).

not insiders of the Debtors and, therefore, their votes would not be excluded by § 1129(a)(10)'s requirement that acceptance for the purposes of that subsection must be "determined without including any acceptance of the plan by any insider[.]" 11 U.S.C. § 1129(a)(10).

The classes containing the claims of the County Treasurer—whose claims were properly classified as impaired, *see In re Greenwood Point, LP*, 445 B.R. 885, 906–07 (Bankr.S.D.Ind.2011)—also constitute accepting impaired classes.

For all the reasons set forth above, the Debtors have satisfied the confirmation requirement set forth in § 1129(a)(10).

### i. Section 1129(a)(11): Feasibility

In this section, the Court addresses an issue raised by PNC—feasibility—that is the subject of the final subsection of § 1129(a) that the Court must analyze before turning to § 1129(b)'s cramdown requirements.

### i. In General

Under § 1129(a)(11), the Court may confirm an otherwise confirmable plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "Although the [Bankruptcy] Code does not use the terms' feasible' or 'feasibility,'" *In re Red Mountain Mach. Co.*, 451 B.R. 897, 906 n. 22 (Bankr.D.Ariz.2011), the requirement imposed by § 1129(a)(11) is commonly known as the "'feasibility' test for confirmation." *Future Energy*, 83 B.R. at 502. "Bankruptcy courts have an affirma-

tive obligation to ensure that plans are feasible." *In re Multiut Corp.*, 449 B.R. 323, 347 (Bankr.N.D.Ill.2011).

The purpose of the feasibility test is to determine whether there is a reasonable probability that creditors will receive the payments provided for in the plan. *See In re G–I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J.2009) ("[T]he key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed."); *Brice Rd. Devs.*, 392 B.R. at 283 ("Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." (internal quotation marks omitted)).

The Sixth Circuit has held that the factors that are relevant to the feasibility determination include the following:

(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management;[12] and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*U.S. Truck*, 800 F.2d at 589. *See also Brice Rd. Devs.*, 392 B.R. at 283 (applying the *U.S. Truck* feasibility factors); *In re Griswold Bldg., LLC*, 420 B.R. 666, 697 (Bankr.E.D.Mich.2009) (same); *In re Christian Faith Assembly*, 402 B.R. 794, 799 (Bankr.N.D.Ohio 2009) (same); *Future Energy*, 83 B.R. at 503 (same). The *U.S. Truck* factors are not exhaustive, and courts also may consider other factors in the feasibility analysis. For example, an-

---

**12.** With respect to the fourth and fifth factors, the Court notes only that it has no concerns relating to either (1) the ability of co-managers Davis and Shorr to properly manage the Trenton Ridge Apartments and the Coventry Apartments or (2) the probability that they will continue as managers.

other factor often considered as part of the feasibility analysis is whether any payments to be made under the plan are dependent upon refinancing or contributions from other sources, *see In re Made in Detroit, Inc.,* 299 B.R. 170, 177 (Bankr. E.D.Mich.2003) (denying confirmation where the debtor was unable to demonstrate likelihood of meeting conditions to secure financing), *aff'd,* 414 F.3d 576 (6th Cir.2005), a factor the Court will analyze further below in connection with its discussion of Trenton Ridge's proposed balloon payment and the cash infusion it hopes to receive from the Member Noteholders.

The purpose for requiring that a plan be feasible is three-fold:

> 1) to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation, 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, and 3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need.

*Future Energy,* 83 B.R. at 502–03 (quoting *In re Agawam Creative Marketing Assoc., Inc.,* 63 B.R. 612, 619 (Bankr.D.Mass. 1986)).

 "The [Bankruptcy] Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *Brice Rd. Devs.,* 392 B.R. at 283 (internal quotation marks omitted). When evaluating feasibility, the Court need not find that a proposed plan " 'guarantee[s] success, but it must present reasonable assurance of success.' " *Id.* (quoting *Made in Detroit,* 299 B.R. at 176). A plan proponent establishes a reasonable

assurance of success if the plan provides " 'a realistic and workable framework for reorganization.' " *Id.* (quoting *Made in Detroit,* 299 B.R. at 176). Put differently, the plan must not be "mere wishful thinking ... [or] based on visionary promises ... [and][t]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Made in Detroit,* 299 B.R. at 176 (internal quotation marks omitted). *See also Griswold,* 420 B.R. at 697 ("Feasibility determinations must be firmly rooted in predictions based on objective fact." (internal quotation marks omitted)).

As explained below, the Debtors have failed to prove by a preponderance of the evidence that confirmation of the Plans is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors. PNC's specific objections to feasibility, however, are not all well-taken. The Court will address each objection so that, if a workable amended Chapter 11 plan is possible in one or both cases, the Debtors will have a basis for formulating such a plan. The Court will address the feasibility issues that PNC has raised as well as an additional issue that the Court is raising independently—lack of evidence of the remaining economic life of the Debtors' income-producing properties—in as chronological a manner as possible, beginning with the effective date and continuing throughout the life of the Plans.

### ii. The Effective Date

 If the Plans were confirmed, the first milestone that the Debtors would need to reach would be the effective date, which each of the Plans defines to mean the date that is 15 days after confirmation, unless an earlier date is selected by the Debtors. PNC suggests that each of the Debtors would default on its obligations under the applicable Plan immediately on the effective date because, given the short

period of time during which the Debtors would have been operating post-confirmation at that point, the only cash on hand for the purpose of satisfying any such obligations would be PNC's cash collateral. *See* PNC Trenton Ridge Br. at 11; PNC Coventry Br. at 10 (sections entitled "The Plan Is Not Feasible Because Debtor Will Not Have The Required Cash To Fund Plan Obligations On The Effective Date"). And PNC apparently would not consent to the Debtors using its cash collateral generated prior to confirmation to make payments to other creditors other than itself after confirmation. PNC argues that the Debtors do not have authority to use the cash collateral without providing adequate protection of its interests and that it would be impossible for the Debtors to provide adequate protection because PNC already has a lien on substantially all of the Debtors' assets.

If a default were likely on the effective date of the Plans, then they would be infeasible on that basis alone. *See In re Save Our Springs (S.O.S.) Alliance, Inc.,* 388 B.R. 202, 244 (Bankr.W.D.Tex.2008), *aff'd,* No. A–08–CA–727–LV (W.D.Tex. Sept. 29, 2009), *aff'd,* 632 F.3d 168 (5th Cir.2011); *In re Fisette,* No. 10–05566–DD, 2011 WL 1833189, at *4 (Bankr.D.S.C. May 12, 2011). The Court, however, concludes that there is a reasonable probability that the Debtors will not be in default of their obligations as of the effective date of the Plans.

PNC does not identify any obligations that will actually be due on the effective date of the Plans. To properly analyze PNC's objection, however, it is necessary to understand not only the amount of cash that the Debtors will have on hand on the effective date and whether such cash constitutes PNC's pre-confirmation cash collateral, but also the nature and amount of the obligations, if any, that will be due on that date.

As an initial matter, the Court does not find that it is necessarily true that the only cash the Debtors will have on hand on the effective date would be PNC's pre-confirmation cash collateral. Whether the Debtors have cash on the effective date from their post-confirmation operations will depend on the timing of the effective date—which could be up to 15 days after confirmation—and the date on which rents are received from tenants after the confirmation date. If the Debtors receive rents after confirmation but before the effective date, then they will have funds available that are not PNC's post-confirmation cash collateral. For that reason alone, the Court is not persuaded by PNC's argument that the Debtors necessarily will be in default on the effective date. Nor would the Court be persuaded by PNC's argument even if the only cash available to make payments under the Plans on the effective date would be the net rents that the Debtors have collected and retained pursuant to agreed orders the Court previously entered authorizing the Debtors to use rents in the ordinary course of business. Pursuant to those agreed orders, the Debtors have paid over $700,000 of net rents to PNC (over $400,000 from Coventry and over $300,000 from Trenton Ridge), but the orders also permitted each of the Debtors to maintain $10,000 of net rents for cash flow purposes. To be clear, the only net rents generated prior to confirmation that could possibly be available to the Debtors on the effective date (without PNC's consent) are those rents that the Debtors were not required to pay and have not already paid to PNC pursuant to the cash collateral orders. The Debtors suggest that other rents might be available because PNC misapplied the net proceeds it received postpeti-

tion and that "as a result, Debtors' use of the funds can be viewed as a re-advance of the principal paid down during the course of the bankruptcy as part of Debtors' monthly adequate protection payments." Debtors' Reply at 10–11. The Court disagrees.

According to testimony elicited during the Confirmation Hearing, PNC allocated a certain amount of the rents it received to real estate taxes and a certain amount to principal and postpetition interest. *See* Tr. II at 80:17–82:25. Because PNC's claims are not oversecured, none of the rents paid to PNC should have been allocated to postpetition interest, *see* 11 U.S.C. § 506(b); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), and the amounts that were allocated to interest should be reallocated to principal. *See In re Oaks Partners, Ltd.*, 135 B.R. 440, 449 (Bankr.N.D.Ga.1991) (holding that net rents paid to undersecured lender pursuant to an agreed cash collateral order that failed to address the manner in which the rents were to be applied should upon confirmation of the plan be applied to reduce the principal amount of debt owed to the lender). In fact, during his testimony, Daniel O'Donnell ("O'Donnell"), Senior Vice–President of Commercial Real Estate Lending at PNC, stated that, if the payments PNC received for net rents were misapplied, then they would instead be applied to principal. *See* Tr. II at 84:24–85:10.

The Court, however, agrees with PNC's counsel that the amounts misapplied should not be made available to the Debtors to fund the Plans. *See id.* at 140:23–141:6 ("[T]he idea that somehow the rents that have been paid postpetition pursuant to the order is and have been applied to the loan somehow are available to fund the plan, I think that, I think that argument should fail for the mere reason that those rents are collateral, they were paid pursuant to the order and the bank being undersecured by definition was not adequately protected."). The Debtors paid the net rents to PNC pursuant to the cash collateral orders, and nothing in those orders prevented PNC from applying the funds in a manner appropriate under the Bankruptcy Code. Although those orders stated only that the Debtors would pay net rents to PNC, not that PNC could apply them, and although the orders are silent regarding how PNC was to apply the funds, the Court believes that the most reasonable interpretation of the orders is that PNC could apply the net rents it received in a manner consistent with the Bankruptcy Code (*i.e.*, in these cases, to principal or real estate taxes, not to interest). The Court does not interpret those orders as contemplating that the net rents paid to PNC would ever be returned to the Debtors, even if PNC misapplied the funds.[13] And there is nothing in the Bankruptcy Code that would require PNC to return those funds when they were paid pursuant to agreed cash collateral orders.

---

13. The Court has the authority to interpret the cash collateral orders. *See In re Fontainebleau Las Vegas Holdings, LLC*, No. 09–21481–BKC–AJC, 2009 WL 5195775, at *4 (Bankr.S.D.Fla. Dec. 30, 2009) (" 'The Court has the inherent authority to interpret the meaning of terms in the Court's own Orders.' *In re Greater Miami Neighborhoods, Inc.*, 2008 WL 4397425, at *1 (Bankr.S.D.Fla.2008); *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009) ('Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.'); *In re Optical Technologies, Inc.*, 425 F.3d 1294, 1300 (11th Cir.2005) (applying clear abuse of discretion standard of review to bankruptcy court's interpretation of its own order 'because a court that issued an order is in the best position to interpret it').").

The Court also agrees that the Plans did not provide that the Debtors could use net rents already paid to PNC to fund payments under the Plans. *See* Tr. II at 141:7–141:13 (PNC's counsel stating that: "[I]f the plan had provided for the use of those funds, the nature of our objections would have been significantly different perhaps as well. The plan doesn't provide for the use of those funds, so we think it's inappropriate for, you know, post-confirmation or post-hearing that somehow those funds be somehow allocated for a use for operations."). Both Plans provide as follows:

> All payments or other distributions provided for by this Plan shall be made from existing funds of Debtor as of the Effective Date, funds generated subsequent to the Effective Date by Debtor through its Business operations, funds realized through the sale by Debtor of any of its property, funds realized through the prosecution and enforcement of claims, demands and causes of action retained by Debtor pursuant to Article VII hereof, less any costs associated with recovering such funds, and the proceeds of any post-confirmation [sic], as may be deemed appropriate by Debtor.

Doc. 100 at 11–12; Doc. 102 at 11. The net rents already paid to PNC, or that should have been paid to PNC pursuant to the cash collateral orders during the cases, do not fall within any of the categories that the Plans describe as the sources of funds to be utilized for making payments under the Plans. *Cf. Ridgewood*, 183 B.R. at 793–94 ("[The cash collateral order provided that] application [of payments of net rents under the cash collateral order] shall not be deemed a waiver by Debtor of its

right to object to such application. The provisions of the Plan calling for a different application of those payments are, in effect, an objection to Fannie Mae's intended application.... [T]he Debtor recognized that the net rents were Fannie Mae's collateral and gave that collateral to the creditor sooner rather than later. By retaining a right to challenge the creditor's purported application of the payments, however, neither the Debtor nor the bankruptcy estate abandoned the estate's interest in those funds by virtue of the cash collateral order.").[14]

Thus, with the exception of funds that have been placed into escrow with the consent of PNC for the purpose of paying prepetition and postpetition taxes (those funds are discussed in more detail below) and funds generated from the post-confirmation operation of their businesses, there is a reasonable prospect that each of the Debtors will have, at most, $10,000 of cash—the balance that each agreed cash collateral order permitted each of the Debtors to maintain for cash flow purposes—with which to make payments that come due on the effective date of each of the Plans.

This relatively small amount of available cash on the effective date does not, standing alone, mean that the Plans are infeasible. Under the terms of the Plans, the only creditors that are to receive payments on the effective date are (1) creditors holding allowed priority claims under § 507(a)(4) of the Bankruptcy Code, (2) the holders of allowed administrative expenses under § 507(a)(2) and (3) the United States Trustee and the Clerk of the Court, which are entitled to certain fees pursuant to 28 U.S.C. § 1930(a). It is questionable whether the Debtors would

---

**14.** At the conclusion of the Confirmation Hearing, the Court requested that the Debtors and PNC address the issues discussed immediately above in their post-hearing briefing, but they failed to adequately do so.

have the authority to use cash collateral generated pre-confirmation to pay such claims. *See Griswold,* 420 B.R. at 706. The Court, however, need not reach that issue here for two reasons. First, as explained above, it is certainly possible that the Debtors will generate revenue between confirmation and the effective date. Second, and most importantly, it appears that there are no claims that will actually need to be paid on the effective date. The claims entitled to priority under § 507(a)(4) are certain prepetition claims for wages, salaries or commissions. Earlier in these cases, the Debtors sought and obtained authority to pay such claims, and they presumably did so. *See* Doc. 22 in Case No. 09–62570; Doc. 25 in Case No. 09–63160. The primary expenses that would constitute allowed administrative expenses under § 507(a)(2) would be the fees and expenses of the Debtors' bankruptcy counsel, and those fees and expenses are typically sought pursuant to applications filed after the effective date. As of the date of this opinion and order, no administrative expenses have been allowed and none therefore would be payable on the effective date. Finally, the Debtors are current on the fees required to be paid by 28 U.S.C. § 1930(a).

For all of the reasons set forth above, PNC's suggestion that the Debtors will be in default immediately on the effective date is not well-taken.

### iii. The Debtors' Post–Effective Date Tax Obligations

PNC also raises issues with the next set of milestones that the Debtors would have to successfully pass after the effective date, which relate to the payment of claims secured by the Debtors' real property. First, PNC questions the Debtors' ability to pay current taxes as they come due after the effective date of each of the Plans. According to the testimony presented during the Confirmation Hearing, those taxes are due in June and January of each year. Records contained on a website maintained by the Franklin County Auditor—of which the Court may take judicial notice, *see Segle v. PNC Mortg.,* No. 10–5655RJB, 2011 WL 1098936, at *2 (W.D.Wash. Mar.25, 2011)—show that the real estate taxes due in January 2011 with respect to the Trenton Ridge Apartments and the Coventry Apartments have already been paid.

Tax payments also will be due in June 2011. Stipulations between the Debtors and PNC extending the duration of the cash collateral orders allow for reserves for the payment of postpetition taxes, and the taxes due in June 2011 presumably will be paid from those reserves. Further, under the terms of the Plans, on the first day of the month after the month in which the effective date occurs, the Debtors will be required to pay the County Treasurer on its allowed secured claim for real estate taxes. The Court concludes that the Debtors' use of any cash collateral to pay both prepetition and postpetition real estate taxes would provide PNC with adequate protection of its interest in its collateral because any current taxes or tax claims that go unpaid would be senior in priority to PNC's claims. In other words, although the use of the cash reserves to pay real estate taxes reduces PNC's pre-confirmation cash collateral, the use of the reserves to pay the taxes results in a concomitant increase in the value of PNC's interest in the real estate itself. *Cf. Griswold,* 420 B.R. at 706 ("[The debtors] do not propose to use th[e] rents [that are the lender's cash collateral] to pay the delinquent property taxes which are senior in priority to the [l]ender, but instead propose to use the [l]ender's rents to pay administrative expense claims and unsecured claims that are junior in priority to

the [l]ender's claims. That is not fair and equitable."). In fact, PNC itself no doubt believes that such use provides adequate protection of its interest. O'Donnell testified during the Confirmation Hearing that it had used approximately $100,000 of the net rents received from Trenton Ridge and approximately $40,000 received from Coventry to pay past due real estate taxes (with the remaining paid to principal and postpetition interest), *see* Tr. II at 81:1–81:7; 82:18–82:25, and that the failure to pay such taxes would have a deleterious effect on PNC's "collateral position" because the taxes have priority over PNC's mortgage lien. *See id.* at 73:7–74:1. And PNC appears to have recognized this in the cash-collateral stipulations when it agreed with the Debtors that the reserves for prepetition and postpetition taxes were "as and for additional adequate protection for PNC[.]" *See* Docs. 248 & 249.

For all of the reasons set forth above, the Court concludes that the Debtors have proven by a preponderance of the evidence that they will be able to meet their post-effective-date tax obligations in the near term.

### iv. The Debtors' Five–Year Projections

As noted above, the Sixth Circuit has specifically identified "the earning power of the business" as a factor relevant to the feasibility analysis. *U.S. Truck*, 800 F.2d at 589. If the Plans were confirmed, the Debtors—after emerging from bankruptcy on the effective date and satisfying their tax obligations that come due shortly thereafter—would face the challenging task of meeting their five-year projections. The Court will address one aspect of those projections—Trenton Ridge's need for a substantial cash infusion from the Member Noteholders in years 2014 and 2015—in the next section of the opinion, but will focus in this section on all other aspects of the Debtors' budget projections. Although the Debtors have succeeded in persuading the Court by a preponderance of the evidence that certain of their budget items are reasonable, they have failed to convince the Court with respect to others.

█ "The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *Multiut Corp.*, 449 B.R. at 347. As a bankruptcy court succinctly explained:

> A critical issue in assessing the feasibility of a plan which provides for the debtor's continued operation is whether the debtor can generate sufficient cash flow to fund and maintain both its operations and obligations under the plan. Specifically, a plan proponent must show that its projections of future earnings and expenses are derived from realistic and reasonable assumptions and that it has the ability to make the proposed payments.

*Crosscreek Apartments*, 213 B.R. at 539 (citations and internal quotation marks omitted).

### 1. Income

On balance, for the reasons stated below, the Court finds that Trenton Ridge has failed to prove by a preponderance of the evidence that there is a reasonable probability that it will be able to meet its income projections, while Coventry has carried its burden in this regard.

█ The Court finds that Trenton Ridge's five-year income projections are not reasonable for two reasons. First, the projections are higher than Trenton Ridge's actual historical performance during its Chapter 11 case. Second, in light of the downward trend in occupancy rates for Columbus-area apartments discussed

in the Weiler Appraisals, Trenton Ridge's projected increases in occupancy rates do not appear to be realistic.

The average gross income projected by the Debtors for 2011 is approximately $129,000 per month for Trenton Ridge and approximately $161,000 per month for Coventry. *See* Trenton Ridge Ex. 5; Coventry Ex. 5. Those projections, the Debtors contend, are based on their actual income generated during the postpetition period. Although that contention appears to be reasonable for Coventry, Trenton Ridge's position that its projections are based on historical performance is belied by a comparison of the actual income generated during its Chapter 11 case from December 2009 through the month in which the Confirmation Hearing was completed. The Court's independent review of Trenton Ridge's operating reports for those months reveals that it had average monthly gross income of $118,153, significantly below its first-year projection.[15]

■■■ To determine whether the projections are reasonable, the Court will "analyze the [Debtors'] projected income and expenses in relation to actual past performance[,]" *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 423 (Bankr.W.D.Mo. 2009), as well as its present performance. *See also In re Hobble–Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr.D.Mont.1988) ("Where a Chapter 11 Plan contemplates funding the Plan payments from operating revenues, its past and present financial records are probative of feasibility."). "Where the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed." *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr.S.D.Tex.1989).

That is the case here with Trenton Ridge's income projections.

Trenton Ridge, like Conventry, contends that two factors make its income projections reasonable: (1) anticipated year-over-year increases of 1% in the amount of rent charged per unit; and (2) increases in occupancy rates from the current 80% to between 82%–89%. It is completely within the Debtors' control to increase the amount of rent they charge per unit. The Debtors did not, however, prove by a preponderance of the evidence that there was a reasonable probability that they could increase rents while maintaining current levels of occupancy, let alone increase occupancy to the extent their budgets require. It is possible that occupancy rates will, as Shorr suggests, increase slightly if the Debtors renovate the properties and improve the quality of the tenant base. But Shorr also testified that factors such as the state of the economy and the quality of surrounding properties negatively affect the Debtors' occupancy rates, *see* Tr. I at 49:1–49:11, and no evidence was presented that either factor was likely to improve. Other than Shorr's testimony, the only evidence in the record bearing on whether the Debtors will be able to increase rents and occupancy rates year-over-year is found in the Weiler Appraisals, which state as follows: "The recovery of apartment vacancy and rents in the near term are expected to be hindered due to a potential acceleration in multifamily permit issuance and the subsequent progression of projects to the construction phases. Asking and effective rents in Columbus will continue to decline into the foreseeable future." Trenton Ridge Appraisal at 31; Coventry Appraisal at 31.

15. By comparison, during the same period, Coventry had average monthly gross income of $160,348, which is only slightly below the average monthly amount of gross income ($160,884.58) called for by its first-year projection.

The Debtors suggest that the statements in the Weiler Appraisals regarding the downward pressures on rents should be disregarded as "vague assertions . . . regarding occupancy trends in multifamily housing in Columbus, generally, rather than to specific factual data relative to the Debtors' properties." Debtors' Reply at 6. There is no evidence, however, that the Trenton Ridge Apartments and the Coventry Apartments are the types of properties that are likely to buck the general trend described in the Weiler Appraisals. At best, the Debtors' properties, like other apartment complexes in the area, could reasonably be anticipated to generate stable rents. *See* Trenton Ridge Appraisal at 28; Coventry Appraisal at 28 ("The apartment market in this area has been characterized by high vacancy and turnover. Rents, however, remain relatively stable."). So the Court does not find a reasonable probability that occupancy rates will increase over the next five years in accordance with the Debtors' projections. Nor does the Court find that there is a reasonable probability that the Debtors will be able to successfully increase rents 1% year-over-year and maintain current levels of occupancy. *See* Trenton Ridge Appraisal at 31; Coventry Appraisal at 31 ("[M]ulti-family property owners and investors should expect decreased rents and higher vacancies for some time in the future.").

For all of the reasons set forth above, the Court does not find it reasonably probable that Trenton Ridge will be able to bridge the gap between its actual historical performance and its projections for the first five years of the Plans. Coventry also has failed to establish that it will be able to realize year-over-year increases of 1% in the amount of rent charged per unit and increases in occupancy rates (for Coventry, from the current 88% to between 89%–96%). As previously noted, however, Coventry currently is, on average, nearly

meeting its first-year projections of gross income, and in certain months is exceeding its first-year projections. Accordingly, unless Coventry's expenses are significantly higher than projected (an issue addressed below), Coventry's success in meeting its projected increases in rent charged per unit and occupancy rates may not be essential to its establishing the feasibility of the Coventry Plan. Although the Court finds that Coventry has not proven the feasibility of the Coventry Plan by a preponderance of the evidence for other reasons explained below, Coventry's five-year projections of income are not the basis for the Court's determination that its plan is infeasible.

By contrast, from December 2009 through the month of the Confirmation Hearing, Trenton Ridge not only has generated average gross income below the first year of the five-year projections, it in fact never had a single month it which it met its projections. For that reason—as well the additional issues facing Trenton Ridge in the form of a cash call and balloon payment discussed in detail below—the Court finds that the Trenton Ridge Plan is even less feasible than the Coventry Plan.

### 2. Expenses

 Certain of the Debtors' expense projections also lead the Court to conclude that they have not established that the Plans are feasible. First, the Debtors project that their operating expenses will increase year-over-year by only 1%, yet they presented no evidence, such as current or forecasted annual inflation rates, showing that their selected rate is realistic. *Cf. In re Snider Farms, Inc.*, 83 B.R. 1003, 1015 (Bankr.N.D.Ind.1988) ("It is difficult for the Court to assume that even if operating expense ratios would remain the same, there would not be a modest annual in-

crease in expenses of two to four percent based on minimal inflationary forces.").

PNC also argues that the Debtors have underestimated the amount of certain expenses, including the cost of insurance projected by the Debtors. Based on the evidence presented during the second day of the Confirmation Hearing, however, including Shorr's testimony and a letter from the Insurance Office of Central Ohio, *see* Tr. II at 111:14–112:18, the Court concludes that the Debtors' estimate of insurance costs is a realistic and reasonable projection.[16]

PNC also contends that the Debtors' estimate for replacement allowances is inadequate. According to the Weiler Appraisals, "[a] replacement allowance provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced periodically during the building's useful life." Trenton Ridge Appraisal at 57; Coventry Appraisal at 57. The Weiler Appraisals note several issues with respect to the condition of the buildings that must be addressed. With respect to the Trenton Ridge Apartments, they include: (1) 17 units that will require significant repairs and/or replacement of components in order to be rentable; (2) exterior deferred maintenance, including broken and crumbling concrete walks and concrete porch stoops; (3) original windows and sliding glass doors in need of replace-ment; and (4) subfloors throughout several units that need to be replaced. *See* Trenton Ridge Appraisal at 34. Similarly, the items that must be addressed at the Coventry Apartments include: (1) 10 units that will require significant repairs and/or replacement of components in order to be rentable; (2) exterior deferred maintenance, including several broken and crumbling concrete walks and concrete porch stoops, and various leaning and broken wood privacy fencing enclosures in the patio areas; and (3) original windows and sliding glass doors in need of replacement. *See* Coventry Appraisal at 34.

The Weiler Appraisals recommend allowances for replacement reserves of $74,525 per year for Trenton Ridge and $88,000 for Coventry. PNC points out that the line items in the Debtors' budgets for replacement reserves are less than the recommended amounts—$40,800 for Trenton Ridge and $48,000 for Coventry.

The Debtors respond as follows:

PNC also asserts that Debtors have not allocated enough money to their respective Replacement Reserves. However, each of the Debtor's overall repair, renovation and replacement budgets is broken down differently than that of the Weiler [A]ppraisals. Debtors have budgeted for these costs in separate categories. The expenses included in the category of Replacement Reserves in the

---

**16.** PNC also questioned whether the Debtors had provided sufficient evidence that their real estate taxes would be reduced by the Franklin County Auditor, but the Court found the Debtors' evidence of a likely reduction to be persuasive. *See* Tr. II at 99:7–100:6. In addition, in an exercise of judicial notice, the Court notes that the Franklin County Auditor has reduced the values of the Trenton Ridge Apartments and the Coventry Apartments for tax purposes to the values set forth in the Weiler Appraisals and that the Debtors' annual taxes have been reduced accordingly. The Debtors, however, have not attempted to supplement the record to provide the Court with this information (and revised projections reflecting the reduced real estate tax expenditures), and the Court therefore will rely on the projected real estate tax expenses contained in Trenton Ex. 5 and Coventry Ex. 5, which were submitted during the Confirmation Hearing. The Court, though, also notes that Trenton Ridge likely would continue to experience budget shortfalls even after taking into consideration the reduction in real estate taxes.

Weiler [A]ppraisals are, in actuality, spread out by the Debtors across three separate budgets: the Replacement Reserve budget, the Repairs and Maintenance budget, and the Renovations and Replacement budget. When looking at these three expense categories, the Debtors' projections provide more than enough funds to maintain the properties. Through year 2015, Debtors' projections will have allocated a total of $1,462,017.36 and $1,894,321.89 for repairs, renovations and replacements at Trenton and Coventry, respectively. These totals, when reflected on an annual basis, far exceed the aggregate amounts of Replacement Reserves called for by the Weiler [A]ppraisals for both properties.

Debtors' Reply at 6–7 (citations omitted).

The Court finds that there has been a failure of proof with respect to the adequacy of the reserves. Although the Debtors are correct that their replacement reserves, when combined with line items for repairs/maintenance and renovations and replacements, exceed through year 2015 the amount that the Weiler [A]ppraisals found to be necessary for certain renovations and repairs, this might tell only half of the story. The other half—which the authors of the appraisal reports or some other expert perhaps could have told if they had testified during the Confirmation Hearing—relates to whether the Debtors' budget would both (1) address all of the issues that need to be addressed related to the quality of the apartment complexes and (2) extend the remaining economic life of the Trenton Ridge Apartments and the Coventry Apartments for an additional 30 years. The testimony provided—from a banker and an investment banker, albeit with experience in real estate industry—did not provide the Court the information needed to determine whether the Debtors' budgeted per-unit replacement reserve (including all of the projected expenditures set forth in Lines 53100 and 5800 of Trenton Ex. 5 and Coventry Ex. 5) will be adequate to fund the amounts that will be required to address all of the properties' repair, replacement and renovation issues and extend the apartments' remaining economic lives as far as necessary to fully satisfy the Debtors' obligations to PNC.[17]

### v. The Cash Infusion from the Member Noteholders

Trenton Ridge's payment to ATF on its tax-certificate claims is projected to be approximately $634,500 in 2014 alone. *See* Trenton Ridge Ex. 5. According to Trenton Ridge's own projections, it will not generate sufficient cash from operations to pay that amount. Moreover, there was no suggestion by anyone on behalf of Trenton Ridge that it would be able to raise the necessary cash through (1) a sale of Trenton Ridge's assets (substantially all of which are encumbered) (2) a refinancing secured by equity in the Trenton Ridge Apartments—there almost certainly would be no equity so soon after the effective date—or (3) any method other than the one suggested by Shorr during the Confirmation Hearing. According to Shorr, Trenton Ridge will be able to make the payment to ATF as the result of an infusion of funds generated through cash calls to its Member Noteholders. The amount of the required cash infusion is substantial. In its projections, Trenton Ridge budgets for a cash call to the Member Noteholders in the amount of approximately $541,000 in 2014 and a cash call of approximately $266,000 in 2015.[18] *See* Trenton Ridge Ex. 5.

---

17. Feasibility issues related to the lack of evidence regarding the remaining economic life of the apartments are addressed more fully below.

18. Given the reduction in real estate taxes,

Despite this, Trenton Ridge presented no evidence that the Member Noteholders have provided a commitment to answer the cash calls or that they would have the financial wherewithal to contribute the necessary funds even if they were willing to do so. Rather, the only evidence presented regarding the likelihood that Trenton Ridge would be able to obtain the funds from the Member Noteholders was the following testimony from Shorr:

Q. And let's, and let's talk about then what happens in '14 and '15 for Trenton

A. Right, for Trenton.

Q. And the unique issue it faces because of the tax certificates.

A. Yeah. I think the tax certificates are, you know, the most challenging part of this. And, you know, they generate, you know, an interest payment of 18% a year. So, you know, as part of at least the reorganized entity, you know, it's clear that we will have to make a cash call in 2014 ... or 2015 to, you know, payoff those tax certificates as, you know, we had promised to do according to the plan. And, you know, given the fact that both, you know, Jack [Davis] and I have been raising equity, we have pretty strong members who are expecting, you know, assured these projections stay as conservative as they are. I mean we would be raising cash for the payment of those tax certificates.

Q. You mentioned you have strong members and here you're talking about the member noteholders?

A. Yes, I'm sorry, the member noteholders.

Q: Approximately, do you recall how much they invested or loaned to Trenton as part of this?

A: They loaned 1.1 million dollars.

Q: Is it your reasonable and good faith expectation that you will be able to raise a cash call or refinancing in 2014 and 2015 to address these tax certificates?

A: Yes, if not sooner. The interest rate is pretty high.

Q: So because of that high interest rate you have a motivation to seek—

A: Absolutely, absolutely.

Tr. I at 65:13–66:23.

Q: Okay, with respect to the cash call that you discussed in response to Mr. Allen's questions, it is a true statement that sitting here today there are no commitments in place for investors or anybody else to satisfy that cash call, is that not true?

A: That is true.

*Id.* at 118:18–23.

The Court cannot, based on this testimony alone, find that there is a reasonable probability that Trenton Ridge will be able to raise the necessary cash in years 2014 and 2015. Although Shorr may have a good-faith belief that the Member Noteholders will contribute the funds, her belief and conclusory statements to that effect are insufficient to establish the Plans' feasibility. Nor is it sufficient that Trenton Ridge has raised funds in the past from the Member Noteholders. *Cf. In re Maluhia Eight, LLC,* No. 10–30986–HDH–11, 2010 WL 4259832, at \*4 (Bankr.N.D.Tex. Oct. 22, 2010) ("While Mr. Morris has certainly raised funds in the past, the present

see n. 16, *supra,* the amount of cash needed may be somewhat less than Trenton Ridge

originally projected.

national economy is different than any we have seen before.").

Rather, at a minimum, to satisfy the feasibility requirement, the evidence regarding the cash call would need to demonstrate two things. First, Trenton Ridge would need to show that the Member Noteholders have committed to provide the necessary cash infusion. *See id.* ("Debtors have placed the cart before the horse. At confirmation, the Debtors must show by a preponderance of the evidence that they can fund the plan, not obtain an opportunity to do so. As the Debtors have little funds on hand, no commitments for funding, and have not even begun the process, the Debtors did not meet the burden of proof on feasibility at confirmation."); *Save Our Springs,* 388 B.R. at 240 (holding that a Chapter 11 plan was not feasible where the debtor offered no evidence demonstrating that it could meet its obligation to fund a creditor settlement fund because there were "no commitments" to make the contributions that would be necessary to do so); *In re Repurchase Corp.,* 332 B.R. 336, 343 (Bankr.N.D.Ill.2005) ("[F]indings of facts that highlighted the glaring deficiencies in the proposed Plan were dictated from the bench. This included a finding that Debtor had failed to prove that funding was available to finance the $100,000 to be paid to creditors or the $500,000 as capital required to restart that business, as required by the Plan. The only evidence offered on that point came in the form of Mr. Greenblatt's testimony that his wife would be the contributing source for needed capital and that Debtor would also enter into 'sharing agreements' for unitization of its NOLs for the purpose of generating cash for post-confirmation operations. But in the absence of any form of corroboration or contract from the alleged sources of these funds, Mr. Greenblatt's testimony amounted to nothing more than sheer speculation and wishful thinking. Allowing Debtor's confirmation to be based on a hope against hope that the financing [would] actually materialize post-confirmation without some form of corroboration would go against a bankruptcy judge's duties of ensuring that the Plan complies with the provisions of the Bankruptcy Code. As the Plan's proponent, Debtor had the obligation of proving that the Plan, as proposed, was feasible. Optimistic but hollow declarations from Debtor's President about hopes for funding did not satisfy its burden of proof." (citations and internal quotation marks omitted)), *aff'd,* No. 05C7075, 2008 WL 4379035 (N.D.Ill. Mar. 24, 2008); *In re Ralph C. Tyler, P.E., P.S., Inc.,* 156 B.R. 995, 997 (Bankr.N.D.Ohio 1993) ("The Plan also provides for financing from outside sources. The Plan, however, does not indicate that there is firm financing in place and no evidence of any commitment to such financing has been provided to the Court. At the point of confirmation, this source of funding must be shown to be firm as it goes directly to feasibility. Without evidence of a firm commitment of financing, this Plan does not meet the feasibility requirement." (citations omitted)).

Second, in order to establish feasibility, Trenton Ridge must provide evidence that the Member Noteholders would have the ability to provide the necessary infusion of cash. *See In re Wiston XXIV, Ltd. P'ship,* 153 B.R. 322, 327 (Bankr.D.Kan.1993) ("As filed, the debtor's plan does not demonstrate that its income will be sufficient to pay its expenses plus the payments due under the plan. The general partner's promise to pay $100,000 cash to the debtor in the next two years is not supported by proof he has any tangible means of satisfying that promise. Without his contribution, the plan shows a negative cash flow, even assuming everything else goes as the debtor has projected . . . ."). *Cf. In re Her-*

*on, Burchette, Ruckert & Rothwell,* 148 B.R. 660, 684 (Bankr.D.C.1992) ("The [feasibility] criticisms leveled by the objectors are insufficient to undermine the assurances of success inherent in the plan. The partners have pledged their performance in notes easily enforceable at state law.... The court finds that the participating partners ... have a reasonable probability of earning substantial amounts of money [with which to make the contributions] in the future." (footnote omitted)). Based on the lack of proof that it will be able to raise the several hundred thousand dollars in cash needed to satisfy its obligation to ATF, the Court finds that Trenton Ridge has not established the feasibility of its plan of reorganization by a preponderance of the evidence.

### vi. The Economic Life of the Trenton Ridge Apartments and the Coventry Apartments

As the Debtors have pointed out, long-term repayments that stretch beyond the term of the original loan are not prohibited per se. *See Mayslake Vill.,* 441 B.R. at 317–18; *In re Mallard Pond Ltd.,* 217 B.R. 782, 785 n. 3 (Bankr.M.D.Tenn. 1997). It is also true, however, "that proof of feasibility is an easier task when the payout is done over a shorter period of time" and that "[t]he § 1111(b) electing creditor, therefore, gains a statutorily granted advantage because the longer the proposed plan, the more difficult it is for the debtor to prove feasibility." *Mallard Pond,* 217 B.R. at 785. Moreover, "[w]hile deferred payment plans are not considered infeasible per se, such plans are subject to close scrutiny...." *Sunflower Racing, Inc. v. Mid–Continent Racing & Gaming Co. (In re Sunflower Racing, Inc.),* 226 B.R. 673, 690 (D.Kan.1998).

Here, the Court has given close scrutiny to the Plans in light of the proposed 30–year repayment term. After doing so, the Court has concluded that evidence of feasibility would be lacking even if the Debtors had demonstrated a reasonable probability that they could meet their five-year projections. In short, for the reasons explained below, both of the Debtors have failed to carry their burden of proof with respect to feasibility because they failed to introduce any evidence regarding the remaining economic life of the Trenton Ridge Apartments or the Coventry Ridge Apartments.

The period over which the Debtors propose to repay PNC is 30 years—either through monthly payments alone or, in the instance of Trenton Ridge, monthly payments and a balloon payment in year 30. Thus, the ability of the Debtors (or a successor of the Debtors if the properties were sold) to repay PNC will depend on their ability to generate net operating income over 30 years. The income-generating properties—the Trenton Ridge Apartments and the Coventry Apartments—are both already approximately 40 years old and will be approaching 70 years old during the final years of the repayment period. As explained above in the section of this opinion regarding the Debtors' projections of income and expenses, the Debtors have failed to establish that addressing the deferred maintenance issues discussed in the Weiler Appraisals would be sufficient to keep the buildings physically viable. But assuming that the Debtors' budget for repairs, maintenance, renovations and replacements were sufficient to keep the physical structures standing for 30 years, the Debtors must nevertheless produce sufficient evidence that the remaining economic life of the Trenton Ridge Apartments and the Coventry Apartments is long enough to support the extended period being proposed for the repayment of PNC's claims.

The remaining economic life of income-producing property depends not only on

the number of years the property will be physically viable, but also on the number of years that the property will be able to produce annual income sufficient to offset items such as expenses and taxes. The Debtors, however, have provided no evidence of the remaining economic life of the apartment complexes. *Cf. In re Brice Rd. Devs., LLC,* No. 05–66007, slip op. at 11 (Bankr.S.D.Ohio Sept. 29, 2006) (finding that the "evidence is uncontroverted that the property, on which construction was largely finished in 2003, has a life span of 50 to 60 years"); *In re Kellogg Square P'ship,* 160 B.R. 343, 366 (Bankr.D.Minn. 1993) (noting that there was no objection to feasibility of plan for debtor that owned commercial real estate where the evidence showed that "the building has an anticipated useful life of at least another 50 years."); *In re Danny Thomas Props. III Ltd. P'ship,* 231 B.R. 298, 302 (Bankr. E.D.Ark.1999) ("He selected the 25–year amortization because twenty-five years is the anticipated length of the economic life of the property, according to an appraisal report he was furnished."), *aff'd,* No. 0860– 4 (E.D.Ark. Dec. 17, 1999), *aff'd,* 241 F.3d 959 (8th Cir.2001); *In re Sagewood Manor Assocs. Ltd. P'ship,* 223 B.R. 756, 761 (Bankr.D.Nev.1998) (stating, with respect to an apartment complex that was 20 years old at the time of confirmation, that the property had a remaining economic life of 40 to 50 years.). The Weiler Appraisals state that one of the steps involved in calculating the value of income-producing property pursuant to the income capitalization approach is estimating the "remaining economic life or the duration and pattern of the projected income stream." Trenton Ridge Appraisal at 44; Coventry Appraisal at 45. So the appraiser purportedly took the remaining economic life into consideration or, at the very least, the remaining economic life factored into the capitalization rate that was selected. The Weiler Appraisals, however, do not identify—nor do they contain any information from which the Court can definitively determine—the remaining economic life of the Trenton Ridge Apartments or the Coventry Apartments. The information provided—including the current age of the buildings and the history of significant deferred maintenance, suggests that the remaining economic life may be substantially less than 30 years.

Nonetheless, it may well be that the Debtors could, if they had another opportunity, demonstrate that the remaining economic life of the apartment complexes is 30 years or more. But the Court cannot simply assume that this is the case. Because the Debtors have not yet established that the economic life of the properties is long enough to generate sufficient income to pay PNC's claims over 30 years, the Court cannot find that the Plans are feasible. *See In re Macon Uplands Venture,* 7 B.R. 293, 312, 314 (M.D.Ga.1980) ("The plan of arrangement extends the original mortgage from its maturity date for an additional term of thirty-three years, which is beyond the economic life of a hotel of this type.... [T]he debtor's plan of arrangement is not feasible as it does not provide adequate protection to Metropolitan nor adequate means for the execution of the plan. Nor is there a reasonable likelihood of rehabilitation."); *Mallard Pond,* 217 B.R. at 787–90 ("The debtor's projections go out only 10 years. The debtor asserts that it will simply continue in the same pattern over the next 50. That assumes, at a minimum, that the Mallard Pond apartment complex will remain a viable, operating entity for the next 60 years, and the proof to support that assertion was thin indeed.... Providing credible evidence of projected cash flow and ability to service plan payments for sixty years hence is a daunting task, and

the debtor has not carried its burden of doing so." (footnotes omitted)).

### vii. The Trenton Ridge Balloon Payment

 Another failure of proof—this time with respect to Trenton Ridge alone—relates to the balloon payment that the Trenton Ridge Plan requires it to make 30 years after confirmation. Providing for a balloon payment does not make a Chapter 11 plan infeasible per se. Rather, as with all feasibility questions, the issue is a factual one: Assuming that there will be no outside source of funds to make the balloon payment (Trenton Ridge has not suggested that any would be available), has Trenton Ridge shown by a preponderance of the evidence that the Trenton Ridge Apartments will have a value 30 years from now that is sufficient to enable Trenton Ridge to make the balloon payment from a refinancing or sale of the Trenton Ridge Apartments? *See Crosscreek Apartments,* 213 B.R. at 540–41 ("The fact that the Partners' plan provides for a balloon payment of the balance of both Condor's secured and unsecured debt at the end of the ten-year plan does not in and of itself render the plan unfeasible. Establishing feasibility of a plan with a balloon payment scheme depends on the debtor demonstrating that the funds will be available at the time the payment is due." (citations omitted)). In *Crosscreek Apartments,* for example, the evidence established that a total balloon payment of $7,031,217 would be supported by an apartment complex worth $11 million at the end of ten years, "which would enable the debtor to refinance the ... debt at a 64% loan to value ratio[,] [t]hese numbers indicat[ing] that the debtor should have little difficulty in obtaining the funds to make the necessary balloon payment." *Id.* at 541.

Trenton Ridge presented no such evidence to the Court. According to Shorr's testimony, the balloon payment required in year 30 of the Trenton Ridge Plan would be approximately $2.5 million. *See* Tr. I at 78:14–78:17. As previously noted, for purposes of the Confirmation Hearing, the parties stipulated that the current value of the Trenton Ridge Apartments is $3,660,000. Assuming that this will be the value of the Trenton Ridge Apartments at the end of 30 years and using Shorr's $2.5 million figure for the amount of the balloon payment, the loan to value ratio of a refinancing in year 30 would be approximately 68%. It seems probable that Trenton Ridge would be able to refinance under that scenario.

The Court, however, is not persuaded that Trenton Ridge has established by a preponderance of the evidence that there is a reasonable prospect that the scenario outlined above will be the one it is facing in 30 years. In *Crosscreek Apartments,* the court had before it testimony regarding the anticipated value of the apartment complex at the time of the balloon payment. *See Crosscreek Apartments,* 213 B.R. at 541. Of course, given the uncertainties in the real estate market, such evidence would necessarily be somewhat conjectural. *Cf. Griswold,* 420 B.R. at 703 ("While predicting the market value of these properties in five years is certainly not an exact science, there is ample other evidence in the record that corroborates [the] testimony that the properties will not have enough value in five years to enable the Debtors to sell or refinance them in an amount sufficient to pay the $30 million balloon payment."). Here, however, Trenton Ridge presented no evidence whatsoever of the projected value of the Trenton Ridge Apartments in 30 years or, again, whether they would have any remaining economic life at that point. According to the Franklin County Auditor's website, the

current value of the land on which the Trenton Ridge Apartments is located is $816,000, a value that clearly would be insufficient to support the refinancing or sale necessary to make a $2.5 million balloon payment.

In some cases, courts have found that "[i]t is reasonable to assume that the Debtor's real property will provide the source for the balloon payment" where there is "no evidence before the Court that the Debtor's real property will decline in value during the course of the Plan." *In re McBride's RV Storage, LLC,* No. 6:09–bk–11279–BB, 2009 Bankr.Lexis 498, at *31 (Bankr.C.D.Cal. Dec. 3, 2009) (10–year balloon). *See also Briscoe,* 994 F.2d at 1169 (15–year balloon). While recognizing that making such an assumption could be reasonable in certain cases in light of the condition of the improvements on the real property involved and the length of time before the balloon payment would be made, the Court finds that making such an assumption would be inappropriate in the instance of Trenton Ridge given the current condition of the Trenton Ridge Apartments, the absence of any evidence of their remaining economic life and the lack of any other evidence of how Trenton Ridge would make the balloon payment. *See F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.),* 341 B.R. 298, 316 (10th Cir. BAP 2006) ("Although a court need not require projections in excess of two years for plans that are longer than two years, the court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded.").

The only evidence presented during the Confirmation Hearing regarding Trenton Ridge's ability to make the balloon payment was Shorr's conclusory statements that she did not see any significant obstacle to a refinancing secured by the Trenton Ridge Apartments. *See* Tr. I at 78:22–78:24. On the evidentiary record presented to it—including the lack of any evidence of the remaining economic life of the Trenton Ridge Apartments—the Court cannot simply assume that the value of the Trenton Ridge Apartments 30 years from now will continue to be the current value, or anywhere close to it. *Cf. Am. Trailer & Storage,* 419 B.R. at 431 ("[The] Debtor should be able to refinance based on the amount of debt reduction and likely asset values. In addition to the Debtor's numbers looking positive for its chances to refinance the balloon payment in five years, the evidence also supports the Court's finding that the collateral is unlikely to decline significantly in value during the reorganization. The useful economic life of the collateral is very long. . . ." (footnote omitted)).

For all of the reasons set forth above, the Court concludes that the Debtors have failed to establish the feasibility of the Plans by a preponderance of the evidence.

## 2. Section 1129(b): The Requirements for Cramdown

In order to obtain confirmation of each of the Plans under § 1129(b) of the Bankruptcy Code, the Debtors must establish that: (1) "all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met" and (2) the Plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). As previously discussed, in addition to failing to meet the requirement set forth in § 1129(a)(8) of unanimous acceptance by impaired classes, the Plans also fail the feasibility requirement of § 1129(a)(11). The Court, therefore, does not have the authority to con-

firm the Plans even if they satisfied the unfair discrimination and fair and equitable tests. Nonetheless, the Court will address the cramdown requirements in light of the possibility that the Debtors could seek confirmation of amended plans of reorganization.

### a. Unfair Discrimination

 The Bankruptcy Code requires that the Plans do not "discriminate unfairly" with respect to any non-accepting impaired class. 11 U.S.C. § 1129(b)(1). "The Bankruptcy Code does not set forth a standard to determine whether a plan discriminates unfairly in a cramdown· scenario[,]" but "[c]ourts agree that the purpose underlying this requirement is to ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes." *20 Bayard Views,* 445 B.R. at 104 (internal quotations marks omitted). *See also United Chem. Techs.,* 202 B.R. at 47 ("A plan that does discriminate unfairly gives unequal treatment to creditors who are similarly situated regarding legal rights and priority." (internal quotation marks omitted)). In the context of unfair discrimination, the phrase "similarly situated" suggests an "inquiry focuse[d] on discrimination among categories of creditors who hold similar legal claims against the debtor, [such as] 'Administrative Claims,' 'Secured Claims,' [and] 'Priority Claims[.]' " *Id.* at 47 n. 12. PNC, which did not accept either of the Plans, and ATF, which did not accept the Trenton Ridge Plan, are secured creditors with an interest in one or both of the Debtors' parcels of real property, as is the County Treasurer. And under the Plans the County Treasurer is to be paid in full earlier than either PNC or ATF. But, as discussed previously, that result follows from the fact that the County Treasurer—unlike PNC and ATF—is entitled to the earlier payment pursuant to § 1129(a)(9)(D). Accordingly, the County

Treasurer's disparate treatment does not violate the unfair discrimination requirement. Likewise, any tenants with security-deposit claims are entitled to priority treatment pursuant to § 507(a)(7), and therefore are not similarly situated to the non-accepting classes of holders of general unsecured claims.

As discussed below, the Member Noteholders' equity interests and the treatment proposed for general unsecured creditors make the Plans unconfirmable pursuant to § 1129(b) in light of the absolute priority rule. The Court, therefore, need not decide whether the disparate treatment of the Member Noteholders also constitutes unfair discrimination. As also discussed below, the Debtors conceivably could address the absolute priority issue either by increasing the payments to unsecured creditors or by having the Member Noteholders make a new value contribution. In that scenario, however, it also is conceivable that the classes of general unsecured creditors would vote to accept the amended Chapter 11 plans, making it unnecessary for the Court to reach the unfair discrimination issue. Accordingly, at this stage of these cases, the Court will focus on the separate requirement that the Plans be fair and equitable with respect to non-accepting impaired classes.

### b. Fair and Equitable Standard as Applied to PNC's Claims

In order to be fair and equitable with respect to a class of secured claims, a plan must provide:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim

deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). Because the subsections of § 1129(b)(2)(A) are set forth in the disjunctive, only one of those subsections need be met in order for a plan to satisfy the specific requirements of § 1129(b)(2)(A). *See Wade v. Bradford,* 39 F.3d 1126, 1130 (10th Cir.1994) ("[B]ecause the debtors' plan satisfied the requirements of § 1129(b)(2)(A)(i), [the] creditor was not entitled to the 'indubitable equivalent' of his claims as described in § 1129(b)(2)(A)(iii). These requirements are written in the disjunctive, requiring the plan to satisfy only one . . . .").

### i. Compliance with the Technical Requirements of 1129(b)(2)(A)(i)

The Plans propose that PNC receive the treatment provided in § 1129(b)(2)(A)(i). The Bankruptcy Appellate Panel for the Sixth Circuit has explained what this section requires when, as here, the creditor has made the § 1111(b)(2) election:

In order for a reorganization plan to now comply with the cram down requirements of § 1129(b)(2)(A)(i)(I), the electing creditor must retain a lien equal to the total amount of its claim. The lien is not stripped down by § 506(d).

Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim.

*Brice Rd. Devs.,* 392 B.R. at 285 (quoting *First Fed. Bank of Cal. v. Weinstein (In re Weinstein),* 227 B.R. 284, 294 (9th Cir. BAP 1998)).

There is no dispute that the Plans provide PNC the treatment described above. Under the Plans, PNC will retain the liens securing its claims. The Plans also provide for PNC to receive, with respect to its claim in each of the Debtors' cases, "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]" 11 U.S.C. § 1129(b)(2)(A)(i)(II). Indeed, PNC conceded during the Confirmation Hearing that the stream of payments it is to receive under the Plans would provide it with the present value of its secured claims and that the payments would fully satisfy the secured claims over the amortization period.

Despite this concession, PNC argues in its post-hearing briefs that the interest rate proposed in the Plans is insufficient to satisfy the fair and equitable standard with respect to its claims. *See* PNC Trenton Ridge Br. at 15 ("The Plan proposes an

interest rate of 5.5% on the restructured Mortgage Note. While such interest rate (in conjunction with the balloon payment) may be sufficient to satisfy PNC's claim, it does not compensate PNC for the additional risk imposed by the 40 year amortization and 30 year balloon payment provided by the Plan."); PNC Coventry Br. at 14–15 ("While such interest rate (in conjunction with the balloon payment) may be sufficient to satisfy PNC's claim, it does not compensate PNC for the additional risk imposed by the 30 year amortization period."). Yet PNC stipulated during the Confirmation Hearing that an interest rate of 5.5% per annum is consistent with fair and equitable treatment of PNC's claims:

> MR. ALLEN [counsel to the Debtors]: The second stipulation is that, with respect to issues under 1129(b) in the fair and equitable issue, that the proposed interest rate or discount rate in the plan of 5.5% is an appropriate rate and is a rate that is consistent with fair and equitable treatment under that section. That stipulation does not concede PNC's right to dispute or challenge any other aspect of the plan vis-a-vis whether it's fair and equitable.

> THE COURT: So we have a stipulation as to value. We have a stipulation as to the interest rate?

> MR. ALLEN: Yes.

> THE COURT: So with respect to that aspect of 1129(b)(2)(A) the parties don't have a dispute.

> MR. ALLEN: That's correct.

> THE COURT: With respect to everything else under 1129(b)(2)(A), (B) or (C) those issues are still on the table?

> MR. ALLEN: Yes.

> MR. JACKSON [counsel to PNC]: That's correct, Your Honor.

THE COURT: Very well.

Tr. I at 6:5–7:3.

PNC's post-hearing assertion that those stipulations did not fully dispose of the interest rate question in the context of the fair and equitable standard because the stipulated interest rate does not compensate PNC for the additional risk imposed by the amortization period is not well-taken. Quite simply, "[d]eferred cash payments consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim" and "[a] properly calculated interest rate should factor in the appropriate risk." *Briscoe,* 994 F.2d at 1169 & n. 47.

 By contesting the interest rate in its post-hearing briefs, PNC suggests that it believes that the interest-rate stipulation was not binding. Whether the stipulation was binding or not depends on whether it was a factual stipulation or a stipulation regarding an issue of law. The Court must treat the interest-rate stipulation as binding and conclusive if it was a factual stipulation. *See Christian Legal Soc. v. Martinez,* —— U.S. ——, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010) ("This Court has ... refused to consider a party's argument that contradicted a joint stipulation [entered] at the outset of th[e] litigation.... [F]actual stipulations are formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission ... is conclusive in the case." (internal quotation marks and citation omitted)). On the other hand, the Court is not bound by stipulations as to questions of law. *See Neuens v. City of Columbus,* 303 F.3d 667, 670 (6th Cir.2002) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, are not bound to accept as control-

ling, stipulations as to questions of law." (internal quotations marks omitted)); *Koch v. United States Dep't of Interior*, 47 F.3d 1015, 1018 (10th Cir.1995) ("While th[e] court will honor stipulations regarding factual issues, [i]t is well-settled that a court is not bound by stipulations of the parties as to questions of law[.]" (internal quotation marks and citation omitted)).

■ In general, whether a Chapter 11 plan provides fair and equitable treatment of a secured lender's claim is a mixed question of fact and law. *See In re Am. HomePatient, Inc.*, 298 B.R. 152, 189 (Bankr.M.D.Tenn.2003), *aff'd*, 420 F.3d 559 (6th Cir.2005); *In re Montgomery Court Apartments of Ingham Cnty., Ltd.*, 141 B.R. 324, 356 (Bankr.S.D.Ohio 1992). For example, a court could hold as a matter of law—and doing so would hardly be controversial—that a plan can satisfy the fair and equitable requirement with respect to a secured creditor only if it complies with the requirements of § 1129(b)(2)(A). But whether a particular interest rate compensates a lender for the risk imposed by a lengthy amortization and remote balloon payment—which is the objection PNC makes to the interest rate in its post-hearing brief—is an issue of fact. *See Fin. Sec. Assurance, Inc. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*, 116 F.3d 790, 800 (5th Cir.1997) (holding that establishing an appropriate interest rate for cramdown purposes required a factual determination); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 686 (D.Mass.2000) ("Interest rate calculations are findings of fact. . . ."); *Kellogg Square*, 160 B.R. at 363 ("[T]he issue translates to whether the Debtor proposes to pay Prudential an appropriate rate of interest on the outstanding principal balance of its claim, over the period the debt is to be amortized. This issue is one of fact[.]" (citation and foot-

note omitted)). At trial, PNC stipulated that the interest rate of 5.5% per annum is sufficient. As a result of this stipulation, the Debtors did not present evidence regarding the appropriateness of the interest rate. Under *Christian Legal Society*, PNC's interest-rate stipulation is binding and conclusive, and the Court therefore need not address PNC's argument that the interest rate is insufficient to compensate it for the risk imposed by the Plans or to satisfy the fair and equitable standard.

The Court, therefore, concludes that the Plans provide for PNC's claims to receive one of the three specific treatments required by § 1129(b)(2)(A).

### ii. Compliance with the General Requirement that a Plan Be Fair and Equitable

PNC, however, argues that merely satisfying the mathematical requirements of § 1129(b)(2)(A)(i) is not sufficient to satisfy the general requirement of § 1129(b)(1) that a plan be fair and equitable. According to PNC, the Court can and should take other factors into consideration when analyzing compliance with the fair and equitable standard. Before discussing the other factors on which PNC relies, the Court will first address whether it is appropriate to require the Debtors to do more than demonstrate compliance with the specific treatment provided for in § 1129(b)(2)(A) in order to satisfy the fair and equitable standard.

■ Although the Sixth Circuit has not addressed the issue, numerous other courts have held that the fair and equitable standard encompasses more than strict compliance with one of the requirements enumerated in § 1129(b)(2). *See Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 505 (4th Cir.1992) ("A plan must be fair and equitable in a broad sense, as well as in the particular manner specified in 11

U.S.C. § 1129(b)(2)."); *Fed. Savs. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.)*, 865 F.2d 673, 675 (5th Cir.1989) ("[T]echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is fair and equitable. Section 1129(b)(2) merely states that the condition that a plan be fair and equitable with respect to a class *includes* the following requirements.... Section 102(3) of the [B]ankruptcy [C]ode states that the word includes is not limiting." (citations and internal quotation marks omitted)); *20 Bayard Views*, 445 B.R. at 105 ("Bankruptcy Code Section 1129(b)(2) sets forth the requirements to treat a dissenting impaired class fairly and equitably. These requirements establish a floor, and satisfaction of these statutory requirements does not guarantee that the plan will meet the fair and equitable standard."); *Griswold*, 420 B.R. at 705 ("Section 1129(b)(2) makes it clear that the condition that a plan be fair and equitable includes the requirements of § 1129(b)(2)(A) and (B), but does not make those requirements the sole test for a determination that a plan of reorganization is fair and equitable."); *In re Sunflower Racing, Inc.*, 219 B.R. 587, 603 (Bankr.D.Kan.) ("The discussion has touched on the three standards for determining whether a cramdown plan is fair and equitable under § 1129(b)(2). Those three standards are not, however, the exclusive gauges of what is fair and equitable. Consulting the legislative history of § 1129(b)(2) and the definition of the word 'includes' used in its text, the courts have concluded the statute sets only minimum standards for what is fair and equitable."), *aff'd*, 226 B.R. 673 (D.Kan.1998). *See also* Kenneth N. Klee, *Cram Down II*, 64 Am. Bankr.L.J. 229, 230–31 (Summer 1990) ("The requirements of section 1129(b)(2) are a necessary part of the fair and equitable rule; but these requirements may not be sufficient to define the rule completely. The preamble to paragraph (2) states that the condition that a plan be fair and equitable with respect to a class *includes* the following requirements.... As a matter of statutory construction, the term includes is not limiting but is open ended. The legislative history of the Bankruptcy Code as well as court opinions support this view. For example, the legislative history states that some factors which are fundamental to the fair and equitable rule were omitted from the statute to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to fair and equitable treatment of a dissenting class." (footnotes and internal quotation marks omitted)). Based on this extensive authority, the Court concludes that—at least in the secured claim context—it may consider factors other than mere technical compliance with § 1129(b)(2) when determining whether a plan is fair and equitable.

In addition to its argument regarding the length of the proposed repayment period, PNC contends that the Plans are unfair and inequitable for three additional reasons. The Court will address those reasons before proceeding to consider PNC's argument based on the repayment periods prescribed by the Plans.

▪ PNC contends that the Debtors' use of its cash collateral to make payments to other creditors under the Plan is not fair and equitable. As explained above, any cash collateral that the Debtors will need to use will be devoted to the payment of prepetition and postpetition real estate taxes. Because any current taxes or prepetition tax claims that remain unpaid would be senior in priority to PNC's claims, the Court concludes that such use is neither unfair nor inequitable. *Cf. Griswold*, 420 B.R. at 706 ("The final grounds argued by the [l]ender[ ] that the third amended plan is not fair and equitable concerns the payment of pre-petition prop-

erty taxes.... [The debtors] do not propose to use th[e] rents [that are the lender's cash collateral] to pay the delinquent property taxes which are senior in priority to the [l]ender, but instead propose to use the [l]ender's rents to pay administrative expense claims and unsecured claims that are junior in priority to the [l]ender's claims. That is not fair and equitable.").

■ PNC also argues that the Plans are not fair and equitable in light of the modification of the due-on-sale clause in the mortgage notes executed by Trenton Ridge and Coventry. Under the original notes, the term "Event of Default" included "[t]he sale (by land contract or otherwise), assignment, mortgaging, leasing, encumbering, refinancing or conveyance of the Property, or any portion thereof or legal or equitable interest therein, *except as otherwise expressly permitted in the Loan Documents*[.]" (emphasis added). The Debtors propose to strike the italicized proviso from each note and insert in its place the phrase "except with respect to any 'insider' of the Maker, as such term is defined in 11 U.S.C. § 101, including any entity whose ownership structure is comprised of not less than 51% of the members of Maker[.]" In addition, the original notes made "[t]he change in the identity of any of the members of Maker, or the pledging or encumbering of any of the membership interests of any of the members of Maker" an Event of Default, but the Debtors seek to modify this provision by adding language excepting from that particular Event of Default "transfers among members, or between Maker and members," which "shall be permitted, as well as transfers made for estate planning purposes[.]" *See* Second Trenton Ridge Plan Modification; Second Coventry Plan Modification. *See also* Tr. II at 12:22–13:25 (Shorr confirming the statements of Debtors' counsel that "you have limited

the due-on-sale provisions to the extent that the transfers made to an insider or for probate, for estate planning purposes and as long as the current insiders own 51% of whatever entity is the transferee" and that "there's no limitation however on the ability, the ability or the requirement that the same entities are individuals who are the co-managing members of the debtor entity, that they remain in that position on a going-forward basis").

> PNC takes issue with this modification: Debtor proposes to modify the due on sale provisions of the existing Mortgage to allow for a change in the ownership entity. Specifically, the Plan proposes to modify the terms of Section 5.1(g) of the Mortgage [Note] to allow for the transfer by an insider of an interest in the Debtor so long as the Debtor continues to be owned by at least 51% of the current owners. The problem with this change is that it allows for Mr. Davis and/or Ms. Shorr, to transfer their interests in the Debtor. If such transfer occurs, there is no guaranty that Mr. Davis and Ms. Shorr will remain active in the day-to-day operations of the Property. As testified to by Mr. O'Donnell, with the Mortgage Loan being extended to a 30 year relationship, PNC has a higher concern than normal regarding who will be the managers of the Property. (Conf.Hr. Tr. 2, pg. 71–72). Extending the Mortgage Loan to 30 years, coupled with the right to change the comanagers of the borrower, is not fair and equitable. PNC is entitled to know that its borrower will not change in midstream.

PNC Trenton Ridge Br. at 15–16; PNC Conventry Br. at 15.

In other words, PNC does not argue that the elimination of a due-on-sale clause pursuant to a Chapter 11 plan is impermissible per se, but rather that a modification

here would be unfair and inequitable because it needs a "guaranty that Mr. Davis and Ms. Shorr will remain active in the day-to-day operations of the Property." The problem with this argument is that PNC points to nothing in the loan documents that entitled it to such a guaranty prior to bankruptcy, nor does it point to anything in the loan documents or the Bankruptcy Code (other than the fair and equitable standard) that purportedly would entitle it to such a guaranty after confirmation. To the contrary, a Chapter 11 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence[,]" 11 U.S.C. § 1123(b)(5), and may also include "any ... appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). "These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990).

Although the case law on the issue is sparse, at least two courts have held that the modification—or even elimination—of due-on-sale clauses does not cause plans to fail to meet the fair and equitable standard. In one of these decisions, a district court rejected the argument that a Chapter 11 plan's elimination of a due-on-sale clause violated § 1129(b)(2)(A) because such elimination meant that the creditor was not retaining its lien as required by § 1129(b)(2)(A)(i)(I). *See FCC v. Airadigm Commc'ns, Inc. (In re Airadigm Commc'ns, Inc.)*, 396 B.R. 747, 755 (W.D.Wis.2007) ("A due-on-sale clause is not a lien. It is a contractual right to accelerate the payment period for a debt upon the sale of property that secures the debt. A lien is 'a charge against or inter-

est in property to secure payment of a debt.' 11 U.S.C. § 101(37). A contractual right to accelerate payment on sale of collateral is entirely distinct from the lien itself. To be sure, it is a valuable contractual right ... but that does not make it a lien and does not bring it within the requirements of § 1129(b)(2)(A)."), *aff'd*, 519 F.3d 640 (7th Cir.2008). Similarly, according to one bankruptcy court, "a due-on-sale clause is not something so sacrosanct that it is immune from modification in a bankruptcy setting." *In re Coastal Equities*, 33 B.R. 898, 905 (Bankr.S.D.Cal.1983) (holding that a Chapter 11 plan that modified a due-on-sale clause "by allowing all notes and trust deeds to be assumable for a period of six years or until a sale of the property" satisfied the fair and equitable requirement and would be confirmed). *See also Brice Rd. Devs.*, slip op. at 21–22 ("[T]he Court also observes that the lack of a due on sale provision does not impair the fair and equitable treatment of GE under the Plan."), *aff'd in part and vacated and remanded in part*, 392 B.R. 274 (6th Cir. BAP 2008). By contrast, to the best of the Court's knowledge, the only decision in which a court has expressed concern over the modification of a due-on-sale clause is *In re 222 Liberty Associates*, 108 B.R. 971, 995–96 (Bankr.E.D.Pa.1990). In that case, the bankruptcy court stated that, "[i]n addition to containing terms contemplating insufficient payment of interest and excessive deferrals of principal and interest, the [plan] contemplates several changes of the terms of the present mortgage—the striking of the 'due-on-sale' clause, the prohibition on placing subordinated mortgages on the Property, and the right of [the mortgagee] to assign the mortgage." *Liberty Assocs.*, 108 B.R. at 995–96. The *Liberty Associates* court concluded that "[t]hese elements ... contribute to the cumulative effect of terms which

fail to allow an adequate § 1111(b) election to [the mortgagee]." *Id.* at 996. Here, though, there is no "insufficient payment of interest and excessive deferrals of principal and interest," and any right that PNC has under the loan documents to assign the mortgage is not being eliminated. Nor has PNC argued that it has not been provided an adequate § 1111(b) election. In fact, PNC not only has made the election, as explained above, it has stipulated that the Plans provide it with the required treatment for a creditor making such an election.

In addition, the modification of each due-on-sale clause in these cases is minor in comparison to the elimination of due-on-sale clauses that has been approved in other cases. As the Debtors point out, "the modifications made to PNC's rights with respect to due on sale relief under the respective Trenton and Coventry loan documents are relatively minimal [because,] [i]nstead of stripping away the protections of such a clause in their entirety, the substance is retained under both Plans, with specifically designed modifications so as to permit transfers among insiders of the Debtors." Debtors' Reply at 17. The Court agrees with that analysis, and for all of the reasons explained above concludes that the modifications of the due-on-sale clauses do not render the Plans unfair or inequitable.

PNC also argues that the Plans are unfair and inequitable because "[t]he existing equity investors have made no contribution in exchange for their equity in the reorganized Debtor." PNC Trenton Ridge Br. at 15; PNC Coventry Br. at 14. This reference to "no contribution in exchange for their equity" suggests that PNC is arguing that the Plans are not fair and equitable because the existing equity holders are not contributing "new value" in exchange for their new equity and

that the Plans accordingly violate the absolute priority rule. If so, this argument is unavailing for PNC. As explained later below, the absolute priority rule is a problem for the Debtors with respect to the Plans' treatment of general unsecured creditors and, if PNC had not made the § 1111(b) election under one or both of the Plans, it would have held such claims. But the absolute priority rule simply does not apply with respect to a fully secured creditor such as PNC. *See Mercury Capital Corp. v. Milford Connecticut Assocs., L.P.,* 354 B.R. 1, 14 (D.Conn.2006); *United Chem. Techs.,* 202 B.R. at 54–55; *In re TCI 2 Holdings, LLC,* 428 B.R. 117, 168–69 (Bankr.D.N.J.2010) ("The structure of § 1129(b)(2)(A), (B) and (C) supports the proposition that the absolute priority rule, which proscribes junior claims or interest from receiving or retaining property under a plan unless senior claims or interest have been satisfied in full, does not apply to secured claims."); *In re Arden Props., Inc.,* 248 B.R. 164, 173–74 (Bankr.D.Ariz. 2000); *Sagewood Manor,* 223 B.R. at 773; *In re Mut. Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assocs.),* 165 B.R. 913, 920–21 (Bankr. D.Ariz.1993) ("[B]ecause MONY has made a § 1111(b) election … MONY has no unsecured claim. With no unsecured claim, MONY's confirmation arguments relative to the new value exception to the absolute priority rule are moot. MONY has no standing to raise those issues."). A minority of courts have disagreed. *See Monarch Beach,* 166 B.R. at 435; *In re Miami Ctr. Assocs., Ltd.,* 144 B.R. 937, 941–42 (Bankr.S.D.Fla.1992). But even if the minority view is correct and the absolute priority rule does apply to secured creditors, all the rule would require with respect to secured claims would be that they receive the specific treatment provided for secured creditors in § 1129(b)(2)(A) before equity holders could receive equity

in the reorganized debtor. *See TCI 2 Holdings,* 428 B.R. at 169 ("[E]ven if the absolute priority rule may be asserted by secured creditors, the application of the rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan." (internal quotation marks omitted)). And, as explained above, PNC's claims are receiving that treatment.

Courts in the minority camp have held that the absolute priority rule is violated if the secured creditor is made to wait for full payment over time while old equity holders receive new equity under the plan. For example, one court found that the plan under consideration unfairly shifted risk to the secured creditor by stretching payments out over a 10–year time period (with a balloon payment at the end of ten years) and that, combined with the "risks associated with hotel loans in general[,]" this made it "questionable whether [the secured creditor] will receive the value of its total secured claim...." *Miami Ctr. Assocs.,* 144 B.R. at 942. But if Congress wanted to address the risk inherent in receiving payments over time under the rubric of the fair and equitable standard in the manner suggested by the *Miami Center Associates* court, it could have required—as it did in other sections of the Bankruptcy Code—that the secured creditor receive "cash on the effective date of the plan equal to the allowed amount of such claim[,]" 11 U.S.C. § 1129(a)(9)(B)(ii)—but it did not do so. In fact, as discussed below, it did not do so with respect to unsecured creditors, to which the absolute priority rule clearly applies. Instead, both secured and unsecured creditors are to receive value "as of the effective date of the plan," and it is an

appropriate interest rate that both provides such value and compensates the creditor for the risk of receiving payments over time. In sum, the Court sees no basis for finding the Plans unfair or inequitable with respect to PNC's claims based on the fact that the Member Noteholders are making no capital contribution in exchange for receipt of their equity in the reorganized Debtors.

■ The Court turns next to the thrust of PNC's argument that the Plans are not fair and equitable—the lengthy proposed repayment periods. According to PNC, the extended repayment periods are unfair and inequitable because (1) the original loans were relatively short term, (2) PNC does not make commercial loans secured by multi-family housing complexes with repayment terms exceeding five years and (3) the Debtors' apartment complexes are already approximately 40 years old. Trenton Ridge proposes to pay to PNC equal monthly installments over a period of 40 years. In year 30, Trenton Ridge will make a balloon payment in the amount of any outstanding balance owed; the original repayment term of the Trenton Ridge Note was three years, was subsequently extended to five years and was then accelerated to become fully due and payable as of Trenton Ridge's petition date. The repayment terms that Coventry proposes will pay PNC monthly installments over a period of 30 years; the original repayment term of the Coventry Notes was three years, was subsequently extended to four years and was then accelerated to become fully due and payable as of the Coventry's petition date.

The Court recognizes that feasibility and fair and equitable treatment are separate statutory requirements. But, quite simply, if a debtor's proposal to pay a lender over an extended repayment period *is not*

*feasible,* then it cannot be fair and equitable—at least not in the broad, nontechnical sense of that term—to allow the debtor to attempt to repay the lender over the extended period. *Cf. In re Orchards Vill. Invs., LLC,* No. 09–30893, 2010 WL 143706, at *20 (Bankr.D.Or. Jan. 8, 2010) (*"No evidence was presented to establish that the reorganized Debtor will be able to refinance its debt at the end of the 7–year term of the TIC Plan. . . .* Were I to overrule NSA's cramdown objections, I would be permitting the TIC Investors to speculate on an uncertain future lending environment not only with their own funds, but with NSA's money as well. I find that is not authorized or appropriate under § 1129(b)(2)(A)(i)(II)"); *In re Kennedy,* 158 B.R. 589, 600 (Bankr.D.N.J.1993) (holding that 20–year repayment period provided for in Chapter 11 plan did not provide creditor fair and equitable treatment and stating that "[a]mong the factors considered in each case to determine whether a particular plan is fair and equitable have been the debtor's demonstration of feasibility, the protections and risks to the secured creditors, and the general reasonableness of the proposals in light of the circumstances posed."). Accordingly, the Court holds that, in light of the lack of evidence presented by the Debtors regarding the remaining economic life of the Trenton Ridge Apartments and the Coventry Apartments and the resulting inability of the Court to find the Plans feasible, the Court cannot conclude that the Plans provide fair and equitable treatment of PNC's claims.

 To be clear, the Court is not holding that Chapter 11 plans that significantly extend the repayment period of prepetition loans can never be fair and equitable. To the contrary, the Bankruptcy Code does not prohibit a debtor from lengthening a payout under a reorganization plan in Chapter 11. *See Bryant,* 439 B.R. at 743 ("Section 1129 does not specifically prohibit a debtor from altering the original repayment period on a loan."); *In re SM 104 Ltd.,* 160 B.R. 202, 231 n. 54 (Bankr. S.D.Fla.1993) ("It has been consistently held that the fair and equitable requirement does not prohibit long term payouts. To be fair and equitable, the proposed stretchout must simply be reasonable." (citations omitted)). The more difficult question is determining what length of repayment is reasonable.

The factors courts have considered in assessing the reasonableness of a repayment period include the typical maximum loan period for similar properties and whether the market would bear terms comparable to those proposed in the plan. *See In re Mace,* No. 08–06124, 2011 WL 284435, at *2–3 (Bankr.M.D.Tenn. Jan. 26, 2011) ("According to Regions, the Debtor seeks a head start instead of a fresh start by proposing repayment terms which exceed terms that would otherwise be offered to other borrowers proposing to pledge rental real properties in the Montgomery County marketplace. . . . The court finds that the market rate in Clarksville is broad enough to include a twenty year amortization as shown by the acceptance of the same plan terms by four other similarly situated creditors in the same market." (citations and footnotes omitted)); *In re Valley View Shopping Ctr., L.P.,* 260 B.R. 10, 37–38 (Bankr.D.Kan.2001) ("[T]he reasonableness of the term of payment is appropriately evaluated under the 'fair and equitable' test, and, what is reasonable may be determined with reference to the term of similar loans in the marketplace."); *In re VIP Motor Lodge, Inc.,* 133 B.R. 41, 45 (Bankr.D.Del.1991) ("At the confirmation hearing, the expert testimony revealed that very few bank loans are being made for hotel/motel ventures and, typically, such loans are several years long with

10 or 15 years being the longest possible commercially available. The proposed plan seeks to extend the Bank's original loan for over 25 years beyond its original term. No evidence was presented suggesting that present market conditions would permit such favorable financing terms as VIP's treatment of the Bank's secured claim, especially with respect to the length of the loan."). In assessing whether a proposed repayment period is fair and equitable, other courts have focused on "whether the extension of the time over which [the lender] will recover its principal unfairly imposes excessive risk on it." *Kellogg Square,* 160 B.R. at 367. For example, the bankruptcy court in *Kellogg Square* held that the "term of the proposed reamortization ... does not unfairly saddle [the lender] with a significant additional risk in recovering the value of its investment in the property" and did so after finding, among other things, that "the commercial mortgage market would not reject a 20–year term for a mortgage loan on this property out of hand [and] the building has an anticipated useful life that significantly exceeds the proposed term." *Id.* (footnote omitted). Once again, given the lack of evidence regarding the anticipated useful life of the Trenton Ridge Apartments and the Coventry Apartments, the Court cannot find that the Plans are feasible or fair and equitable.

 If feasibility were not an issue, however, the Court would—in light of PNC's § 1111(b) election and its stipulation to the appropriateness of the 5.5% interest rate—have concluded that the repayment periods would not impose an unfair or inequitable risk on PNC. The Debtors' choice of the repayment period was driven by the § 1111(b) election, and that election itself provides significant protection to PNC. *See In re Union Meeting Partners,* 160 B.R. 757, 769 (Bankr.

E.D.Pa.1993) ("Section 1111(b) represents an attempt by Congress to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment.... [*S*]*ections 1111(b), 1124 and 1129 permit the secured lender to protect itself so as to insure reasonable treatment under a plan.* Thus, section 1111(b) protects the legitimate expectation of the secured lender that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors.") (quoting 5 *Collier on Bankruptcy,* § 1111.02, at 1111–18 (15th ed. 1993) (emphasis added)). And the selection of an appropriate interest rate further provides protection to the lender. *See, e.g., Kellogg Square,* 160 B.R. at 363 ("[T]he proponent of the plan [must] identify a rate of interest that could be earned on a risk-free investment, such as that currently paid on a United States treasury bond of like term, and then to augment that rate by an increment that is sufficient to compensate the secured creditor for the risk it will bear over the term of the reamortization, as a result of the reorganized debtor's retention of the possession of the collateral."). Indeed, the selection of an appropriate discount rate often is the most difficult aspect of cramdown cases such as these. *See Mayslake Vill.,* 441 B.R. at 319 ("According to the case law ... the Debtor may rewrite the contract and extend the repayment period, thereby turning a short-term loan, like the one in the case at bar, into a long-term obligation. The difficulty is not in mechanically computing a present value calculation and discounting deferred payments by a rate of return or interest factor to reflect the opportunity cost of capital. Rather, the difficulty lies in the selection of the appropriate discount rate." (citation omitted)). Here, however, PNC has stipulated to the appropriate discount rate. In addition, under the Plans, the lien required

by § 1129(b)(2)(A)(i)(I) would remain in place until PNC's total allowed claim is paid in full. *See* Second Trenton Ridge Plan Modification; First Conventry Plan Modification ("PNC shall retain its lien upon the Debtor's assets subsequent to Confirmation until payment in full of its Allowed Secured Claim, as set forth herein."). The lien retention also provides PNC with fair and equitable treatment. *See In re Bloomingdale Partners,* 155 B.R. 961, 974 n. 7 (Bankr.N.D.Ill.1993) ("Congress [arguably] enacted § 1111(b) to prohibit debtors from cashing-out creditors at judicially determined values; however, the literal language still permits a debtor to cash-out a creditor by stretching payments out over a long enough period of time so that no economic value is paid against the deficiency balance. [One legal commentator has argued that] the lien required by § 1129(b)(2)(A)(i)(I) must remain in place until a note evidencing the creditor's total allowed claim is paid in full [and that] [a]nything less ... would not be fair and equitable.... Th[is] question[] need not be resolved in this case since the Debtor offered Hancock exactly what [that commentator] ... suggest[s] may have been the result intended by Congress." (citations and internal quotation marks omitted)). Moreover, the Debtors do not propose to defer the payment of interest or provide for a negative amortization of interest, which some courts have found to be unfair and inequitable. *See Liberty Assocs.,* 108 B.R. at 995.

Furthermore, the only evidence presented regarding the market for loans of the repayment period proposed by the Debtors supported a finding that such a market exists. O'Donnell, PNC's own representative, testified that there are lenders who will loan money to borrowers with multifamily apartment complexes as collateral with repayment periods extending 30 years.

Q: Are there lenders that make commercial loans to multi, secured by multifamily apartment complexes that extend perhaps 30 years?

A: Certainly, there are many lenders that will do that ... there are life insurance companies, there are CMBS which is Commercial Mortgage Backed Securities market that will do this. There are pension funds that will do long-term fixed-rate financing in accordance with the terms that are being requested here.

Tr. II at 40:14–40:25.

For all of the reasons set forth above, if feasibility of the Plans had been established, the Court would have found that the Plans were fair and equitable with respect to PNC's claims despite the extended repayment periods.

### c. The Fair and Equitable Standard as Applied to ATF's Claim

As previously noted, ATF did not accept the Trenton Ridge Plan, and the cramdown requirements therefore apply to it despite its failure to object to that plan. In light of the interest rate being provided to ATF and its lien retention rights, there is no doubt that the Trenton Ridge Plan satisfies the technical requirement of the fair and equitable standard with respect to ATF's claim. In short, ATF is to retain its lien to the extent of the allowed amount of its claim and also is to receive on account of that claim deferred cash payments totaling the allowed amount of its claim, with a present value— as of the effective date of the Trenton Ridge Plan—of its interest in Trenton's Ridge's interest in the collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(i). But Trenton Ridge has not established by a preponderance of the evidence that it will be able to raise the cash necessary to satisfy ATF's

claim. As it did with respect to PNC's claims, therefore, the Court concludes that the Trenton Ridge Plan fails the non-technical component of the fair and equitable standard with respect to ATF.

### d. The Fair and Equitable Standard as Applied to General Unsecured Claims

 In an exercise of its independent duty to determine that the Plans comply with the cramdown requirements with respect to non-accepting classes even in the absence of an objection by a creditor in that class, the Court will next consider the fair and equitable standard as it applies to the classes of general unsecured claims. "[A] plan is deemed fair and equitable as to a dissenting class of unsecured creditors only if it does not violate the absolute priority rule...." *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 678 (6th Cir.2006).

Although the term "absolute priority rule" itself does not appear in the Bankruptcy Code, the rule is set forth in § 1129(b)(2)(B):

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> ....
>
> (B) With respect to a class of unsecured claims—
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property....

11 U.S.C. § 1129(b)(2)(B). For the reasons explained below, the Plans do not satisfy the prong of the absolute priority rule set forth in § 1129(b)(2)(B)(i), nor do they satisfy the prong set forth in 1129(b)(2)(B)(ii).

 The Plans do not provide for the treatment of general unsecured claims that would result in "each holder of a claim of such class receiv[ing] or retain[ing] on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim[,]" 1129(b)(2)(B)(i), for two reasons. First, the Plans provide for quarterly payments to unsecured creditors *until the earlier* of: (1) payment in full of all allowed claims in the class, without interest; or (2) the date that is five years from the applicable petition date. Under the Plans, if the earlier event turns out to be the date that is five years from the applicable petition date, then the quarterly payments will cease before the allowed general unsecured claims are paid in full. That result would not satisfy § 1129(b)(2)(B)(i), under which "the allowed value of the claims held by th[e] [non-accepting unsecured] class is to be paid in full...." *Dow Corning*, 456 F.3d at 678. Second, even if the earlier event were payment in full of allowed claims in the general unsecured class, the Plans still would not satisfy § 1129(b)(2)(B)(i) because the payment would be in full "without interest," and paying a claim over time without interest does not provide the holder of the claim "value, *as of the effective date of the plan,* equal to the allowed amount of such claim[.]" 11 U.S.C. § 1129(b)(2)(B)(i) (emphasis added). *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214–15 (9th Cir. 1994) ("Given the debtor's retained interest, Everett and those in his class were entitled to one hundred cents on the dollar. But what does this mean when a class is

paid off over time? Is it enough for the class to receive the nominal value of what is owed to it, even though the present value of the payment stream is less than the full amount of the debt? Clearly not. As we recently held in *In re Johnston*, 21 F.3d 323, 329 (9th Cir.1994), a cram-down may proceed only if the objecting class of creditors is paid full present value. In other words, such creditors must be paid interest for the post-confirmation time value of their money." (footnote omitted)); *In re Cornwall Pers. Ins. Agency, Inc.*, 308 B.R. 771, 774 (Bankr.N.D.Tex.2003) ("A debtor may pay an unsecured creditor with deferred payments over the life of the plan until such creditor's claim is paid in full. It is not enough, however, that the debtor merely pay the principal amount of such claim overtime.... [T]he present value requirement necessitates the payment of interest when the debtor proposes to pay a claim over a period of time." (citations omitted)); *Am. HomePatient*, 298 B.R. at 189 n. 38; *Crosscreek Apartments*, 213 B.R. at 545 ("Under subsection (i), future payments to the holder of an unsecured claim must equal the present value of that claim as of the effective date of the plan. Notwithstanding the fact that the Partners' plan provides for payment in full of Condor's unsecured claim over the life of the plan, subsection (i) has not been met because Condor is not receiving the present value of its claim as it is not being paid interest to account for the delay and risk in payment."); *In re Keaton*, 88 B.R. 154, 156 (Bankr.S.D.Ohio 1988). This is perhaps a minor point in these cases given the relatively small dollar amount of unsecured claims and the failure to assure full payment and provide for interest is perhaps an oversight on the part of the Debtors. If so, it is an oversight that the Debtors, not the Court, must fix. The Court does not have the authority to presume that the Debtors intended to offer the unsecured creditors full payment and interest and certainly does not have the authority to modify the Plans to provide for either. *See Brice Rd. Devs.*, slip op. at 20–21 ("The Court is aware of no authority in the Bankruptcy Code or Bankruptcy Rules which allows the Court to modify the Plan.").

The Debtors contend that the Plans do not violate the absolute priority rule because the Member Noteholders are receiving membership interests in the reorganized Debtors on account of their claims arising from the promissory notes they received from the Debtors, not on account of their existing equity interests in the Debtors. The Court is not persuaded by this argument. It is perhaps true that the Member Noteholders are not receiving the equity in the reorganized Debtors solely on account of their prior equity interests. But the equity is being offered only to them and to the other existing equity holders (Davis and Shorr). *Cf. In re Alta+Cast, LLC*, No. 02–12982(MFW), 2004 WL 484881, at *4 (Bankr.D.Del. Mar. 2, 2004) ("The Plan does not give the shareholders, qua shareholders, the right to invest in the reorganized Debtor. Instead, only creditors are given that opportunity. Although some of the creditors are also shareholders, the Plan is permitting them to invest only on account of their claims, not on account of their shareholder interests.... [In *Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) ] [t]he Supreme Court objected to the LaSalle plan's grant to shareholders of an exclusive right to invest in the debtor.... In this case, the Debtor is permitting all unsubordinated creditors, as well as outsiders, to invest. This meets the mandate of *LaSalle*."). Here, there is no "investment" being made for the new equity. The lack of any investment by the

existing equity holders, however, would seem to make it even more difficult for the Debtors to successfully argue that the holders of existing equity are not receiving their new equity interests "on account of" their prior equity interests when the new equity is available only to them. If the Members Noteholders had made an investment, then one question would be whether the investment had been made available to others and whether the funds invested qualified as new value. But here the Member Noteholders have offered no new value.

There is little doubt that the opportunity to participate as equity holders of the reorganized Debtors arises in a significant way from the prior status of the Member Noteholders as well as from the status of Davis and Shorr as equity holders. Accordingly, the Member Noteholders and Davis and Shorr (who are not Member Noteholders and have not even asserted claims against the Debtors) are receiving the new equity "on account of" their prior equity interests within the meaning of § 1129(b)(2)(B)(ii). *See Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs., L.P. (In re Coltex Loop Cent. Three Partners, L.P.)*, 138 F.3d 39, 43 (2d Cir.1998) ("As applied here, the words 'on account of' in § 1129 seem very straightforward. If Congress had intended to modify those words with the addition of the words 'only,' 'solely,' or even 'primarily,' it would have done so. For the court to add such modifiers would work a significant and unwarranted change in the meaning and consequence of the statute. Thus, we conclude that if old equity's new interest under the plan results in any significant way from its old status, the plan may not be confirmed.").

As previously noted, Shorr and Davis are not Member Noteholders. An argument perhaps could be made that Shorr and Davis are receiving equity in the reorganized Debtors on account of their services they are to perform for the Debtors going forward, but the Debtors have not made that argument and any such argument would be belied by Shorr's own testimony:

Q. Finally, Ms. Shorr, you see Class D1, the equity interest, can you just explain generally what that is?

A. Yes. There was a distinction, there are equity owners in this entity that are not member noteholders. And I would basically view that as those providing, quote, unquote, "sweat equity." And all of the interest of those members as well as all the other equity interests will be wiped out according to the proposed plan.

Tr. I at 37:20–38:4.

Q. Let's assume for a minute the Court finds that we have met our required burdens to confirm these plans. Do you anticipate both you and Mr. Davis will continue as the co-managers of the entities?

A. Yes.

Q. Do you receive any compensation or remuneration for serving in that role?

A. Well, since we've been in bankruptcy we have not received any remuneration but Spectrum, our company, would be paid an asset-management fee for doing the various tasks that we do such as reporting, making adjustments to staff policy procedure, tenant issues, things of that nature.

Q. How much is that fee proposed to be?

A. $3,000 a month.

Q. For each entity?

A. For each entity.

Q. Okay, but you and Jack personally will receive no remuneration, is that correct?

A. That is, I think that the plan also anticipates that we will have an ongoing equity interest.

Q. Well, I understand but I meant as compensation for services as manager?

A. Oh, no. That's it, asset-management fee only.

*Id.* at 43:19–44:20.

In sum, "the best reading of the phrase 'on account of' indicate[s] that 'a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates the absolute priority rule[,]'" *Young Broad. Inc.,* 430 B.R. at 140 (quoting *LaSalle,* 526 U.S. at 451, 119 S.Ct. 1411), and the Court finds that there is insufficient evidence in the record that the Member Noteholders, Shorr and Davis are not receiving new equity on account of their prior equity interests. Nor is the Court persuaded by the Debtors' suggestion that the Member Noteholders are providing value to the bankruptcy estates by foregoing the recovery being provided to general unsecured creditors—a recovery that, given the large dollar amounts of the Member Noteholders's claims, would be de minimis.

 Finally, the Plans violate the absolute priority rule even if, as the Debtors contend, the Member Noteholders stand to receive no cash until other creditors are paid in full. *See In re Cantonwood Assocs. Ltd. P'ship,* 138 B.R. 648, 657 (Bankr. D.Mass.1992) ("[The] Supreme Court [has] squarely rejected the debtor's alternative argument that the absolute priority rule has no application where the property which the junior interest holders wish to retain has no value to the senior unsecured creditors.") (citing *Northern Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57

L.Ed. 931 (1913)). *See also In re Homestead Partners, Ltd.,* 197 B.R. 706, 712 (Bankr.N.D.Ga.1996). In light of the foregoing, the Court concludes that the Plans violate the absolute priority rule.

## VI. Conclusion

For the reasons set forth above, confirmation of the Plans is **DENIED.**

**IT IS SO ORDERED.**